[No. 28671. Department Two. October 5, 1942.]

MARY TRUE ALLEN, *Appellant,* v. JAMES P. DILLARD, *as Executor, et al., Respondents.*[1]

[1]Reported in 129 P. (2d) 813.

*Clarke & Eklow* (*True, Meyer & Crawford,* of counsel), for appellant.

*Dillard & Powell,* for respondents.

. BEALS, J.—The late Dr. John Arthur True, a physician who for several years practiced his profession in Spokane, and plaintiff, Mary True Allen, were brother and sister, and nephew and niece, respectively, of Dr. Margaret Johnson, also a physician who for many years practiced her profession in the city of Spokane.

Plaintiff filed two actions before the superior court for Spokane county, naming as defendants in each action James P. Dillard, as executor of the last will and testament of plaintiff's aunt, Margaret Johnson, deceased, together with other persons named as beneficiaries under Dr. Johnson's will, or being her heirs at law. In one action, plaintiff sought specific performance of an alleged oral agreement between her deceased brother, Dr. John Arthur True, and Dr. Margaret Johnson, while in the other action she sought to impose a trust in her favor upon certain property belonging to the estate of Dr. Johnson, which was bequeathed by the testatrix to certain of the defendants.

In her complaint in the suit to establish a trust for her benefit, plaintiff alleged that her brother and her aunt were for many years associated together in the practice of medicine, and that there existed between them a close relationship of trust and mutual confidence; that, on or prior to July 9, 1934, Dr. True informed Dr. Johnson that he wished to leave the latter half of his estate, so that, in case of his death prior to that of his aunt, the latter would be able to enjoy her life in comfort, but that Dr. Johnson should by her will leave the property so bequeathed to her by Dr. True to the plaintiff or to her children; that Dr. Johnson acquiesced in the expressed wish of her nephew, and Dr. True, relying upon Dr. Johnson's statement that she would carry out his wishes, made his will, leaving one-half of his estate to Dr. Johnson; that, on the same

day, and for the purpose of carrying out Dr. True's expressed wish and intention, Dr. Margaret Johnson executed her will, providing that, in case Dr. True should not survive her, and should leave no issue, all of her property should go to plaintiff, or, in case of plaintiff's decease prior to the death of the testatrix, to plaintiff's child or children; that, relying upon Dr. Johnson to carry out his expressed wish, Dr. True made no change in his will, and died July 26, 1935; that Margaret Johnson qualified as executrix of his will, and received and accepted, in her individual capacity, under that will an undivided one-half of his estate.

Plaintiff further alleged that Margaret Johnson, in violation of the trust and confidence reposed in her by Dr. True, and of his expressed desire and intention, revoked her will which she had executed July 9, 1934, and executed another will, which failed to carry out the trust imposed upon her; that Margaret Johnson died October 20, 1940; that her later will was probated, and defendant James P. Dillard, who was named therein as executor thereof, qualified as such executor, and ever since has been acting as such; that Dr. Johnson's estate was appraised at over twenty-five thousand dollars, and consists of property within Spokane county, Washington.

Plaintiff prayed for a decree adjudging that defendant executor and the beneficiaries under Dr. Johnson's will hold all of that portion of Dr. Johnson's estate which came to her under Dr. True's will in trust for plaintiff, and that the defendants be required to perform the obligation of Margaret Johnson.

The defendants answered this complaint with simple denials, praying that the action be dismissed.

In the other action which plaintiff instituted, asking for a decree of specific performance, she included in her complaint practically the same allegations above

set forth, adding, however, an allegation to the effect that Dr. True and Dr. Johnson agreed that the former would leave one-half of his estate to Dr. Johnson, and that the latter, in consideration of the agreement, promised to leave all of her estate to Dr. True if he survived her, or to his issue if he should predecease her, leaving issue, and if Dr. True should predecease Dr. Johnson, leaving no issue, then to the plaintiff or her children. In this action, plaintiff prayed that the court decree specific performance of the alleged agreement between Dr. True and Dr. Johnson to make mutual wills, as above described.

Defendants answered this complaint with denials.

The two actions were consolidated, and having come on regularly for trial, plaintiff having rested her case, the defendants moved that the actions be dismissed, upon the ground that the evidence introduced by plaintiff failed to establish any cause of action against defendants. The court having granted this motion, judgment was entered dismissing the action, from which judgment plaintiff has appealed.

Error is assigned upon the court's ruling that the testimony of Oliver True, to the effect that his cousin, Dr. John Arthur True, told him a few days after the execution of the wills of Dr. Johnson and himself, executed July 9, 1934, that these wills had been made, and upon what agreement they had been made, was inadmissible. Error is also assigned upon certain rulings of the court; upon the refusal of the trial court to grant appellant any relief; and, finally, upon the judgment dismissing the consolidated actions.

By his will dated July 9, 1934, Dr. True, after directing the payment of any just claims against his estate, bequeathed all his property to his aunt, Dr. Margaret Johnson, and his sister, Mary True Allen, in equal portions, providing that if either legatee should pre-

decease the testator, then the survivor should receive his entire estate, and that, if both legatees should predecease the testator, the entire estate should go to the children of his sister, Mary True Allen, appellant herein. The will contains no restriction or limitation whatsoever upon the bequest to Dr. Johnson, who was appointed sole executrix thereof.

By her will, also bearing date July 9, 1934, Margaret Johnson bequeathed her entire estate to Dr. True, if he should survive the testatrix, providing that, if Dr. True should not survive the testatrix but leave children, one-half of her estate should go to his children and the other half of her estate to appellant, Mary True Allen, or her children. If Dr. True should predecease the testatrix, leaving no children, then the entire estate should go to Mary True Allen, if living at the date of Dr. Johnson's death, or her children in case Mrs. Allen should not then be living.

Neither will contained any statement that the testators had agreed to make mutual wills, nor made any reference to the will of the other testator.

Dr. True died July 26, 1935. His will was probated and letters testamentary issued thereon to Margaret Johnson. His estate was appraised at $28,799.48, his debts were estimated at less than two thousand dollars, and the estate, which consisted entirely of personal property, was declared solvent. The original file of the probate proceeding is in evidence, and does not show that the estate has ever been closed.

Dr. Margaret Johnson died October 20, 1940, and a will which she executed October 26, 1939, was admitted to probate and letters testamentary thereon issued to James P. Dillard, who was named in the will as executor thereof. By this will, Dr. Johnson bequeathed to appellant, Mary True Allen, bonds of the face value of two thousand dollars, which were appraised at $1,-

695.88. She bequeathed to her sister, Emma Coomer, the bulk of her estate, which was appraised at $25,-963.75. In the order of solvency which was entered, it is stated that debts due from the estate did not exceed five thousand dollars.

Margaret Johnson was a sister of the mother of Dr. True and appellant, and the relationship between Dr. Johnson and Dr. True had always been very close and affectionate—as the testimony indicates, more like mother and son than aunt and nephew.

Oliver True, a practicing lawyer residing in Port Clinton, Ohio, and Dr. John Arthur True were first cousins and very intimate, having been brought up together.

In support of her contention that Dr. True and Dr. Johnson had agreed to make mutual wills, and had executed the wills bearing date July 9, 1934, pursuant to that agreement, and that, because of the subsequent death of Dr. True, Dr. Johnson was precluded from making any subsequent will to appellant's detriment, appellant offered the evidence of her cousin, Oliver True. Respondents strenuously objected to the important portion of Mr. Oliver True's testimony, and the court admitted the same over respondents' objection and subject to later argument as to its admissibility. The court's final ruling upon this point was that the testimony was inadmissible, and, as the testimony of Mr. Oliver True was practically the sole support of appellant's principal contentions, when this testimony was excluded, the court granted respondents' motion for dismissal of the action, and entered judgment accordingly.

Oliver True testified that, during the month of July, 1934, Dr. True visited Port Clinton, Ohio, having gone there from Spokane to inter, in the family lot where his father was buried, the body of his mother, who

had died the previous March. Mr. True testified that July 14, 1934, in Port Clinton, he had a conversation with Dr. True, who called him aside from a family group, saying that he wanted to talk to the witness, who narrated the conversation as follows:

"He said then that he and Aunt Margaret had agreed to a disposition of their property, he had agreed—withdraw that—that he had taken some losses, and so had Dr. Margaret, during the depression, and he wanted to be sure that she had enough to live on as long as she lived, in case anything happened to him; that he and she had agreed that he was to leave her half of his estate, which he told me was larger than hers, and that she had agreed to leave him all of her estate if he survived her, and if he didn't survive her, all her property was to go to his children, if he left children, and if he didn't, to Mary True Allen, his sister, and, if she had died, to her children. At that time Mrs. Allen had one child. He also gave me copies of his wills, which he stated Mr. Dillard had prepared for him for that purpose.

"By the Court: Q. His will? A. Both wills, Dr. Margaret's will and his own, and they were enclosed in an envelope bearing Dillard & Powell's letterhead. He stated that they had been prepared by Mr. Dillard. He brought them to me, inasmuch as he told me that in case Margaret died before he did, or was unable, by reason of her health, or something of that sort, to act as executor, that he had me in mind as executor. Then he showed me the wills and repeated that they contained what he and Dr. Johnson had agreed to. Q. Do you mean, Mr. True, that he stated to you that the agreement between them was expressed in the wills? A. Well, that the things that they had agreed to do were expressed in the wills, yes. The wills themselves didn't show that they were made pursuant to an agreement, in words, but he stated that the wills contained things that Aunt Margaret and he had agreed to do, and that he wanted me as the executor, or as his friend and cousin, also, to see that the terms of those wills were carried out in accordance with the agreement, whether he was present or not. He left the wills

with me and asked that I keep them in a safe place so I would have them to refer to in case of the death of either Dr. Johnson or Dr. True.

"By Mr. Clarke: Q. Have those wills and that envelope been in your possession ever since July 14, 1934? A. They have."

The copies of the wills referred to were marked for identification, and are in the record, being copies of the wills executed July 9, 1934, as above set forth.

During the course of the examination of Oliver True, appellant's counsel frankly stated that her case must stand or fall on Oliver True's testimony. On Mr. True's direct examination, he testified that he suggested to Dr. True that the agreement between the latter and Dr. Johnson might be invalid by reason of the fact that there was no writing evidencing the same. The witness further testified that he (Oliver True) would trust Dr. Johnson to carry out Dr. True's wishes without any written agreement to that effect, and stated that Dr. True said that he was sure that his wishes would be carried out.

In support of her action for specific performance, appellant herself testified over respondents' objection that, in answer to her inquiry to Dr. True as to whether she would receive any money from the family, her brother wrote her, saying, as appellant testified:

"He said that it was to be his pleasure to educate both of my children; that he and my aunt had made a will protecting me and my family, and he said not to worry, that I was his sole heir, and that my aunt was going to leave me something, but that she had others to leave things to, but that she was going to leave me something. As far as I remember, that is what he said."

In this connection, it should be remembered that Dr. True left half of his estate to appellant, and that

in her will Dr. Johnson left appellant a substantial bequest.

A witness who had been in the employ of Dr. True testified, also over respondents' objection, that Dr. True had told him that Dr. Johnson would see that appellant would be taken care of, as he (Dr. True) had an agreement with Dr. Johnson to that effect.

Another witness testified that Dr. Johnson had said, with reference to the property which she had inherited from Dr. True, "It is Mary's," or "It is to be Mary's." In addition, a friend of both doctors testified that Dr. Johnson said, "I wouldn't ever think of using any of his money for myself, because I know that he intended that for Mary."

With reference to appellant's action for specific performance, the following question should be considered: Was the testimony of Oliver True, above quoted, inadmissible as hearsay? If it be held admissible, it would be necessary to consider the further question of whether or not an oral contract to make mutual wills may be proven when the wills themselves contain no reference to any such agreement.

 Contracts to make mutual wills are recognized under our law as valid and, when sufficient facts are proven by competent evidence, such contracts may be specifically enforced. *Prince v. Prince*, 64 Wash. 552, 117 Pac. 255; *In re Fischer's Estate*, 196 Wash. 41, 81 P. (2d) 836. In principle, such contracts bear great similarity to agreements to devise or bequeath property in return for services to be rendered to the testator, or for some similar consideration moving to him. If there has been no attempted revocation by either party during the lifetime of both, a matter which will be discussed later, courts generally will enforce such contracts, if a valid agreement is proven; and it is the

general rule that a party or a beneficiary to such a contract may maintain a suit for specific performance or some other appropriate relief. Because, however, of the great opportunity for fraud, and because of reluctance on the part of courts to render ineffective a subsequent will of a testator, the contract to make mutual wills must be established by clear and convincing evidence. *Resor v. Schaefer,* 193 Wash. 91, 74 P. (2d) 917; *In re Fischer's Estate, supra.*

In the recent case of *In re Fischer's Estate, supra,* we said:

"An oral promise to make a will or an oral contract to devise or bequeath property must be established by evidence that is conclusive, definite, certain, and beyond all legitimate controversy."

Many authorities are cited in support of this proposition.

This rule as to the *quantum* of evidence necessary to establish a contract such as that upon which appellant relies is applicable in the case at bar.

This court, *In re Edwall's Estate,* 75 Wash. 391, 134 Pac. 1041, held that the widow of Peter Edwall had not maintained her claim that she and her deceased husband had agreed to make mutual wills, and, pursuant to the agreement, had executed such wills with due formality. It appeared that the wills were executed as alleged by the widow, but a later will made by the husband was upheld, it appearing that no agreement to make the mutual wills, one in consideration of the other, was proven. It appeared that Mr. and Mrs. Edwall executed the wills on the same day, each testator bequeathing his entire estate, except nominal bequests, to the other. Neither disclosed on its face any evidence indicating that it was executed in consideration of the other will, or pursuant to any contract. This court assumed that the widow, in her

attempt to set aside the later will executed by her husband, introduced sufficient oral evidence to show that the wills, which had been executed on the same day, "were made in pursuance of such a contract between appellant and the deceased as would render those wills revocable before the death of either only by agreement or upon notice." As real estate was involved, this court held that, in the absence of written evidence that the parties had agreed to make mutual wills, one in consideration of the other, oral evidence afforded an insufficient basis upon which to grant the widow the relief that she asked, and since the widow was unable to introduce any written evidence in support of her contention, the decree of the superior court denying her any relief should be affirmed.

In the case of *McClanahan v. McClanahan*, 77 Wash. 138, 137 Pac. 479, a case in which real estate was also involved, this court followed the opinion *In re Edwall's Estate, supra,* in holding

". . . that the making of a will in pursuance of a contract required by the statute of frauds to be evidenced by a writing, did not constitute a part performance of such contract so as to render the same enforceable."

*In re Weir's Estate,* 134 Wash. 560, 236 Pac. 285, it was held that parol evidence was not admissible to show an express trust concerning real property alleged to have been established pursuant to an oral agreement between a mother and her daughter to make mutual wills for the ultimate benefit of a sister of the daughter, the mother and daughter executing wills simultaneously, the mother by her will leaving all her property to the daughter who executed the will above referred to, the mother declaring that she made no provision for her other daughter because she was well provided for, and the daughter by her will leaving all her property

to her sister, neither will containing anything to indicate that any such agreement had been made. After the death of the mother, the daughter to whom she had bequeathed her property denied that she was bound to leave her property to her sister, and, in an action by that sister to enforce the agreement, it was held that such a contract as the one sought to be proven created an express trust, and could not be shown by parol evidence.

In the case of *Rogers v. Joughin,* 152 Wash. 448, 277 Pac. 988, it appeared that Floyd G. Rogers and Cora Edith Rogers were married in October, 1917. Mrs. Rogers had previously been married to one Woodrow, from whom she had been divorced, and from whom she had received certain property, which she owned at the time of her marriage to Mr. Rogers. She also owned some other property, some of which she had inherited from her parents. In August, 1927, Mrs. Rogers purchased from an insurance company a paid-up annuity bond, providing for payments to her during her lifetime, the principal sum to be payable to certain of her relatives. Mrs. Rogers died in January, 1928, leaving a will which was admitted to probate, Mr. Rogers being appointed executor thereof.

Mr. Rogers then brought suit against the beneficiaries of the annuity bond, alleging that he and his wife had orally agreed that all their property should be considered as community property, and that the same, upon the death of either spouse, should go to the survivor; that in July, 1927, he and Mrs. Rogers executed mutual wills, each leaving all his property, whether community or separate, to the other, and that this was the will of Mrs. Rogers which was admitted to probate.

Mr. Rogers further alleged that, after the making of these wills, Mrs. Rogers secretly and without his knowledge withdrew from the safe deposit box in which he

and Mrs. Rogers kept their property, United States bonds of the value of over nine thousand dollars, with which she purchased the annuity bond above referred to, and by so doing violated the agreement to make mutual wills. He sought to recover the annuity bond for his own benefit, and appealed from an adverse judgment entered by the superior court. This court cited *In re Edwall's Estate, supra,* and *In re Weir's Estate, supra,* as authority for the proposition that

"Where mutual wills have been executed and no reference is made therein to any agreement for the execution of such wills, parol evidence of such oral agreement is not admissible."

It appeared that the agreement, as testified to by Mr. Rogers, was made before the marriage of the parties, and that at that time they executed mutual wills, and the court held that such an agreement, not being in writing, was void under the statute of frauds (Rem. Comp. Stat., § 5825 [P. C. § 7745]), as being an agreement made in contemplation or in consideration of marriage. It was held that Mr. Rogers was not entitled to the annuity bond, as it had been purchased by Mrs. Rogers with her separate funds. Referring to some contention that the evidence showed a trust in favor of Mr. Rogers, we said:

"If it be conceded that the effect of the agreement which is pleaded in the above quoted portions of the complaint was simply an agreement to make a will, then, even though not an enforcible agreement, it was, as a matter of fact, fully performed. If it be claimed that the agreement went further and created a trust, then an express trust cannot be proven by parol. *Belcher v. Young,* 90 Wash. 303, 155 Pac. 1060. If it be claimed that there was an implied trust created by reason of the execution of the wills, that contention is answered by *Dolan v. Weir, supra,* [134 Wash. 560, 236 Pac. 285]."

This court, *In re Krause's Estate,* 173 Wash. 1, 21 P. (2d) 268, upheld a contract between Charles A. Krause and his sister-in-law, Auguste Krause, to make mutual wills. The contract was in writing, and mutual wills were made pursuant thereto, the will of Mrs. Krause (she having died after having made a later will in favor of one W. J. Von Miller) reciting that it was "made pursuant to a contract." In an action by Charles A. Krause, this court held that the plaintiff was entitled to specific performance of the contract between himself and his sister-in-law to make mutual wills. The contract which was enforced was, as above stated, in writing, and was expressly referred to in the wills.

*In re Fischer's Estate,* 196 Wash. 41, 81 P. (2d) 836, this court affirmed a judgment of the superior court granting specific performance of an oral contract between husband and wife to make mutual wills. The spouses had made wills, bearing date the same day, each in favor of the other. They continued to live together for twenty years thereafter, when the wife died. It then appeared that eight years previous to her death she had executed a will, making no mention of her husband, but bequeathing her property, outside of a two hundred dollar bequest to a sister residing in Denmark, to a sister residing in the state of Washington, with whom the wife was on intimate terms. The trial court set aside the will in favor of the sister, holding that the surviving husband was entitled to specific performance of the agreement which he contended had been made between himself and his wife. On appeal, this court affirmed the judgment of the trial court. In the course of the opinion, many authorities were considered. Concerning contracts to make mutual wills, the court said:

"Contracts to devise or bequeath property, although not favored in law, are nevertheless enforcible, if the terms of the contract, the intention of the parties, and the adequacy of consideration are established to the satisfaction of the court by the degree of proof required, and no fraud, overreaching, or other inequitable circumstances of controlling effect is shown. [Citing cases]"

We also said:

"An oral promise to make a will or an oral contract to devise or bequeath property must be established by evidence that is conclusive, definite, certain, and beyond all legitimate controversy. [Citing cases]"

The *Edwall* and other similar cases were referred to as authority for the rule that a contract to devise real estate or to bequeath and devise both real and personal property is within the statute of frauds, and, in the absence of a written agreement, a sufficient part performance or full performance of the contract must be shown.

The court also observed:

"In the very nature of things, each case of this kind must rest upon its own peculiar facts and circumstances. [Citing cases]"

It was held that the oral contract relied upon was established by the degree of proof required, and that full and adequate performance of the contract sufficient to take it without the restrictions of the statute of frauds had been shown.

This court has definitely held that an agreement to make mutual wills is within the statute of frauds, if real property is involved, or real and personal property. We have also held that the making of mutual wills is not sufficient part performance to take the agreement without the statute of frauds, in the absence of any other consideration. We have also defi-

nitely fixed the quantum of proof required to establish such a contract.

■ There is a further question concerning mutual wills which should be discussed, because of the bearing it has upon the admissibility of the testimony of Oliver True, to wit: Is a contract to make mutual wills revocable while both parties to the contract are living and capable of executing a new will?

In the *Edwall* case, this court expressly reserved the question of whether an agreement to make mutual wills after the execution of the wills might be revoked by one testator during the lifetime of the other, and upon notice to him.

In the case of *Prince v. Prince, supra,* this question was also reserved, the quotation from Underhill's Law of Wills included in the opinion indicating that such a revocation might be made (of course upon notice and in the absence of consideration other than the execution of the mutual wills).

Of course, after the death of one of the testators a different situation is presented; but, if no present consideration has passed between the parties, other than a mutual agreement to execute wills, it is difficult to understand why a mutual will may not be revoked without incurring any liability for breach of the contract, provided, of course, that the other testator is afforded an ample opportunity to make a new will, and has not changed his position, to his detriment, in reliance upon the agreement.

As in the case at bar the death of Dr. True prior to the death of Dr. Johnson fixed the rights of the parties, the question of the possible right which both Dr. True and Dr. Johnson enjoyed to make a new will during the lifetime of both, is only of indirect importance here as having some bearing upon the admissibility of Mr. Oliver True's evidence concerning the conversa-

tion between himself and Dr. Arthur True, when the question of whether or not Dr. True's statement was against his interest is considered.

Of course, a will may be revoked or changed by a new will. In such cases as this, the only question is whether or not the *contract* between two parties to make mutual wills may be revoked. It is the contract which may be irrevocable, not the making of the will.

The general rule is stated in 69 C. J. 1301, § 2724, as follows:

"An agreement to make mutual wills, or the execution of wills in pursuance of such an agreement, does not bind the testators to keep the property, covered thereby, for the intended beneficiaries under such wills, or prevent them from making such other disposition of it, either inter vivos or by will, as they may desire and mutually agree, while both or all still live. Moreover, while both or all of the parties to such an agreement are yet alive, any party may recede therefrom, and revoke his will or make a different disposition of his property, on giving proper notice to the other party or parties of his act in so doing, or where such other or others have actual knowledge thereof; but a revocation or alteration of his will by one of the parties to such an agreement in secret, or without notice to, or the knowledge of, the other or others, although all are yet alive, does not release such party from his obligations under the agreement, and it remains enforceable against him."

The reason for the general rule is suggested by the following quotation from an article in 9 Wis. L. Rev. 267, entitled "Contracts to Devise and Bequeath":

"The only justification for permitting unilateral renunciation of a valid contract is to be found in the general desire to continue a man's power to alter the testamentary disposition of his property until his death, and the fact that no great harm is done to the other party since he can make a new will. The loss of his bargain by one party is not considered as undesirable

as the loss of his power to make a will by the other. But if there is no notice, it seems clear that the innocent party is likely to suffer much more than merely the loss of his bargain."

This court, *In re Krause's Estate, supra,* enforced a contract to make mutual wills, although one party had attempted to revoke his prior will by the execution of a later will during the lifetime of both parties. It clearly appeared, however, that, during the lifetime of both parties, the survivor had expended money for the benefit of the property of the other, relying upon the agreement to make mutual wills, and upon the wills which had been executed, and had so changed his position, in reliance upon that contract, that he would suffer serious injury were the contract not enforced.

In the late case of *In re Fischer's Estate, supra,* this court upheld an agreement between husband and wife to make mutual wills, the wife having thereafter made a second will, but in that case the survivor had had no notice of the attempted repudiation of the agreement by the other party until after the testator's death.

In Atkinson on Wills, p. 177, § 70, it is suggested that it should not be stated positively that in all cases contracts to make mutual wills may be revoked by either party during the life of both testators, upon due notice. The author seems to criticize the rule that such contracts are subject to such revocation. Doubtless no definite rule should be laid down. As has been repeatedly said in connection with such questions as that now under discussion, each case must be determined upon its own facts.

In 1 Schouler on Wills, Executors and Administrators, p. 820, § 720, the rule that mutual wills may be revoked during the lifetime of the testators, on notice, is apparently recognized.

It is the very essence of a will that, under ordinary

circumstances, the same is revocable, either by destroying it or making a new will. A document of a testamentary nature which cannot be revoked is something more than, and different from, a will. It would seem that an understanding between two or more persons that they would execute mutual wills, and the subsequent execution of such wills, no present consideration passing, and no testator having subsequently altered his position to his detriment, relying upon the understanding, should be revocable during the lifetime of the parties, upon adequate notice of the revocation or intended revocation. In expressing this view, we do not intend to state a definite rule applicable in all cases.

▮ We shall now consider the question of whether or not Oliver True's testimony was admissible. Clearly, it was hearsay evidence, as it was an out-of-court statement made by Dr. True, offered to prove the truth of the allegations of appellant's complaint. Appellant argues that his testimony was admissible under an exception to the hearsay rule, in that it was a statement against Dr. True's interest. This exception, long recognized by the courts, is based upon the theory that no person will falsely assert as a fact something which is directly against his interest, and that, for this reason, the statement comes with a sufficient guaranty of trustworthiness to justify its admission in evidence, despite the lack of the sanctity of an oath and the privilege of cross-examination. 5 Wigmore on Evidence (3d ed.), p. 262, § 1457. Of course, before such a declaration may be admitted, the necessity to resort to an out-of-court statement must appear, and the fact that the declarant is dead normally presents such an occasion for the admission of the evidence. As Dr. True is dead, this element is present in the case at bar.

It is also essential that the facts as stated by the ab-

sent witness be against his proprietary or pecuniary interest; that he believe them to be so against his interest at the time the declaration was made; and that he have knowledge of the facts concerning which he spoke.

It is easy to state the requirements of the rule, but much difficulty frequently arises in determining whether some particular testimony offered is or is not admissible. Since the very essence of this exception to the hearsay rule is the concept that no man will make false statements which are adverse to his pecuniary or proprietary interest, one element to be determined is whether the declarant's statement is actually a statement of facts against his interest.

In 5 Wigmore on Evidence (3d ed.), p. 267, § 1461, it is stated that

" . . . the interest injured or the burden imposed by the fact stated should be one so palpable and positive that it would naturally have been present in the declarant's mind."

31 C. J. S. 962, § 219, is to the same effect.

Giving to Dr. True's statement a reasonable interpretation, we have his assertion that he had entered into an agreement with Dr. Johnson to execute mutual wills, and that such wills had, in accordance with the agreement, been executed. Conceding that, in making this statement, Dr. True recognized some contractual obligation on his part, does this in itself make it a declaration of a fact against his interest?

In 5 Wigmore on Evidence (3d ed.), p. 269, § 1461, is found the general statement that "the incurring of a contract liability of any sort is on principle a fact against interest." Concerning a contract involving a mutual contractual obligation, the rule is stated in 1 Jones on Evidence (4th ed.), p. 605, § 329, as follows:

"While an entry may be introduced in evidence if it shows only a prima facie liability on the part of the declarant, yet the entry is not admissible where it merely discloses a contract and consequent mutual obligations. In speaking of an entry recording an informal· agreement for labor, it was said by Lord Coleridge: 'This was not an entry against the party's interest, unless the mere making of a contract be so, and if that were the case, the existence of a contract would be against the interest of both parties to it.' In such a case it is to be presumed that the terms of the agreement were fair and equitable and not to the disadvantage of either party."

In the case at bar, Oliver True testified that Dr. True told him that he wanted him (Oliver True) "to see that the terms of those wills were carried out in accordance with the agreement, whether he was present or not." This shows that Dr. True was satisfied with the agreement, and wanted it carried into effect.

It should also be remembered that there is good authority in support of the proposition that an agreement to make mutual wills may, even after the making of the wills, be broken by either party upon notice, provided that no present consideration has passed, and that neither party has altered his position, to his detriment, in reliance upon the contract. Under this line of authority, it might well be contended that such an agreement as that described in the conversation sought to be introduced in evidence in the case at bar as against Dr. True's interest did not concern such a contractual obligation as in fact limited the pecuniary or proprietary rights of Dr. True, the declarant.

In any event, we are convinced that the trial court properly refused to receive in evidence Oliver True's testimony concerning the conversation with Dr. True. Dr. True's statement does not fall within the exception to the rule, because of the manner in which

it was sought to be used. If an action had been brought against Dr. True's estate to enforce the contract and to require that his property be disposed of in accordance with the alleged agreement between him and Dr. Johnson, a different situation would have been presented. Assuming for the purposes of argument only, and not deciding, that such a contractual obligation, as that concerning which Dr. True spoke, impaired his proprietary or pecuniary rights, such a statement might have been admissible as against his interest as a recognition of a contractual obligation.

The statement, however, is not sought to be used in that manner. The testimony offered was not for the purpose of proving that Dr. True had promised to dispose of his property in a certain manner, but, on the contrary, it was offered for the purpose of proving that Margaret Johnson had promised to leave her property to Dr. True, or in the event of his death without issue, to appellant, Dr. True's sister. In so far as this phase of the contractual obligation was concerned, Dr. True stood to benefit by the agreement. It was for his interest, not against it.

Courts have recognized that the same fact may or may not be admissible under this exception, according to the situation of the parties in the particular case. A fact may be against a person's interest from one viewpoint, and for his interest from another. In 5 Wigmore on Evidence (3d ed.), p. 269, § 1463, is found the following:

"A fact thus stated may or may not be against interest according to the *circumstances*. For example, a statement that one is *not* a partner in a certain firm states a fact which favors one's interest if the firm is insolvent (and a deficit is therefore to be made up), but disfavors one's interest if the firm is solvent (and profits are thus to be shared); while a statement that

one *is* a partner in the firm states a fact for and against interest in just the reverse situations.

"Again, the same fact may or may not be against interest according to the *parties' situation in the case* in which it comes into dispute; it may be against interest in one aspect, but in favor of interest in another."

This matter is ably discussed by the court of appeals of Kentucky, in the case of *Cryer v. McGuire*, 148 Ky. 100, 146 S. W. 402, as follows:

"In rebuttal the plaintiff put in evidence certain declarations or statements made by Elias B. Cryer, to the effect that he intended to let his father, Edwin Cryer, live upon the lands throughout his life. It is urged that the admission of this testimony was error. We agree with the appellants' contention. Had this testimony been offered by Edwin Cryer, in a contest between him and Elias B. Cryer, or the plaintiff as his heir, it would have been competent, because the declarations by Elias B. Cryer would have been against his interest. But when they were offered in favor of Elias B. Cryer they were declarations not against interest and, therefore, were inadmissible. It is not the words spoken alone which determines their admissibility as declarations; but it is the circumstances surrounding the party speaking and the nature of the litigation when the testimony is offered which determines the admissibility of the testimony. A given statement may or may not be against interest, according to the circumstances, or according to the parties in dispute."

Dr. True's statement that Dr. Johnson had agreed to leave her property to him, or to his sister, was a self-serving declaration on Dr. True's part. The fact that this statement may have been coupled with a statement to the effect that Dr. True had agreed to leave his property to Dr. Johnson, affords no sufficient basis for the admission of the statement to prove facts which were beneficial to the declarant.

The supreme court of Georgia, in the case of *Hollis v. Sales*, 103 Ga. 75, 29 S. E. 482, distinguished between

the purposes for which a statement by a deceased person may be received in evidence. It appeared that a deed from a deceased husband to his wife was under attack as fraudulent, and the question of whether or not there had been any consideration moving to the husband for the deed was important. A statement by the husband to the effect that he had made the deed to his wife because he was indebted to her, was introduced in evidence. While recognizing that the declaration that he had conveyed his land to another was a statement against interest, the court rejected the statement, in so far as it was sought to be used to prove the issue of consideration, as in that respect it was a self-serving statement indicating the satisfaction of a debt.

██ The only statement made by Dr. True which by any possibility could be considered as against his interest, was that he had agreed to dispose of his property in a certain manner. The remainder of his conversation with Oliver True contained no statement against Dr. True's interest. A statement which under some circumstances may be against the interest of the declarant may not be used to prove matters as to which the statement is not against his interest. 5 Wigmore on Evidence (3d ed.), p. 264, § 1458.

It might well be held that Dr. True's statement was not sufficiently against his interest to be admissible in evidence even if offered against his estate. It is the rule that the facts declared must not only be against the declarant's interest, but they must be obviously so at the time the statement was made. The possibility that the facts stated might at some time, in some indefinite manner, result in some injury to his pecuniary interest, or proprietary interest, is not sufficient to justify the admission of evidence concerning a statement of such facts. To justify the admission of such

a statement, the detriment to the declarant must be apparent; this to insure the trustworthiness of the statement as indicating that the fact of injury to his interest must in all probability have been present in his mind. 5 Wigmore on Evidence (3d ed.), p. 267, § 1461.

As the only guaranty of the truth of these statements is the fact that they are against the declarant's proprietary or pecuniary interest, the adverse character of the declaration, and the interest as to which they are adverse, must be clear. We are convinced that the statements which Oliver True testified were made to him by Dr. True were not so obviously adverse to Dr. True's interest as to bring the statements within the exception to the hearsay rule. These statements, in the light of all the surrounding circumstances, clearly indicate that the uppermost thought in Dr. True's mind, at the time of his conversation with Oliver True, was not that he had incurred an obligation by making the agreement, but rather that he had succeeded in providing for his aunt and sister in the event that he should predecease them. It does not appear that it could have occurred to him that the facts which he declared were against his interest, nor does it appear that he was aware that any of his pecuniary or proprietary rights had been adversely affected by the agreement.

The trial court did not err in rejecting the evidence of Oliver True concerning his conversation with his cousin, Dr. John Arthur True.

The other evidence offered by appellant, including declarations both by Dr. True and Dr. Johnson, even if admissible, does not prove the existence of the contract which appellant alleges was made. Appellant's testimony to the effect that her brother had written her that her aunt was going to leave her something, proves

nothing, as Dr. Johnson did leave appellant a substantial bequest. The testimony of the other witnesses as to statements made by Dr. True and Dr. Johnson are general in their nature, and do not even tend to support appellant's contention that a contract was made between Dr. True and Dr. Johnson.

Evidence to the effect that Dr. True and Dr. Johnson executed wills on the same day, that the wills were signed by the same witnesses, drawn by the same attorney, and contained somewhat similar provisions, is not of itself evidence that the wills were executed pursuant to an agreement to make mutual wills. *In re Edwall's Estate,* and *McClanahan v. McClanahan, supra.*

The evidence is wholly insufficient to support a decree in appellant's favor, either adjudging specific performance of the alleged contract to make mutual wills, or to establish a trust for appellant's benefit in a portion of Dr. Johnson's estate.

The judgment appealed from is affirmed.

ROBINSON, C. J., BLAKE, MILLARD, and JEFFERS, JJ., concur.