## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| FRANK PORTMANN, | No. 49563-5-II |
| Appellant, | |
| v. | |
| SALLY HERARD, in her capacity as Personal Representative of the Estate of Donald Lewis Cross, | PUBLISHED OPINION |
| Respondent. | |

MAXA, A.C.J. – Frank Portmann appeals the trial court's order granting summary judgment in favor of Sally Herard, acting as personal representative of the estate of Donald Cross, in his Trust and Estate Dispute Resolution Act (TEDRA)[1] action. Portmann initiated the TEDRA action to specifically enforce the distribution of the remainder of the estate in Cross's 1998 will and to invalidate inconsistent portions of Cross's 2010 will.

The issue in this case is whether Cross and his life partner Glen Morse agreed to execute "mutual wills" in 1998 that became irrevocable after Morse's death in 2000. Portmann, the son of Morse's niece and a beneficiary under Cross's 1998 will, claims that Cross and Morse had an oral agreement to execute mutual wills. Herard claims that there was no agreement to execute mutual wills and that Cross was free to change his will after Morse's death. The trial court struck portions of a declaration made by Eric Pickle, the husband of Cross's niece, about

---

[1] Ch. 11.96A RCW.

statements Cross and Morse made to him. The court then ruled that Portmann had failed to create a genuine question of material fact regarding the existence of an oral agreement between Cross and Morse to execute mutual wills.

We hold that (1) the trial court did not err in striking as hearsay the portion of Pickle's declaration stating that Cross and Morse had told him that they had agreed to bequeath half of the survivor's remainder estate to the other's family members, to the extent that the declaration was offered to establish the existence of an agreement to execute mutual wills; and (2) the trial court did not err in granting summary judgment because the evidence Portmann submitted did not create an issue of material fact on whether Cross and Morse entered into an agreement to execute mutual wills.

Accordingly, we affirm the trial court's order granting summary judgment. We also exercise our discretion under RCW 11.96A.150 to award attorney fees on appeal to Herard.

FACTS

*Execution of Wills*

Cross and Morse were domestic partners beginning in the 1960s, and owned multiple properties together. They executed separate wills with the assistance of attorney Gaylerd Masters in both 1992 and 1995. The wills had similar provisions and generally provided that upon the death of the testator, the remainder of the estate would pass to the surviving partner. The wills also provided that upon the survivor's death, the remainder of the survivor's estate would be divided between Cross's family members and Morse's family members.

In January 1998, Cross executed a revised will that Masters drafted. The will provided that if Morse predeceased Cross, certain specific distributions would be made and the reminder of the estate would be distributed one-fourth to Cross's sister Herard, one-fourth to Cross's sister

Donna Warter, and one-half equally among Morse's sister Minnie Campbell, Campbell's daughter Darlene Portmann, and Portmann's sons Eric and Frank.

On the same day that Cross executed his revised will, Masters also had drafted a revised will for Morse. But Morse wanted to think more about the beneficiaries of his will, and so he did not execute a revised will at that time.

In September 1998, Morse executed a revised will that Masters again drafted. This will was different than the draft will Masters had prepared in January 1998. The will made specific bequests to Campbell, Darlene, Eric and Frank, and left the remainder of the estate to Cross. If Cross predeceased Morse, the will provided a specific bequest of paintings and sculptures and that the remainder would be divided one-half equally among Campbell, Darlene, Eric and Frank, and one-half equally between Herard and Warter.

*Morse's Death and Cross's Revised Wills*

Morse died in 2000. His property was distributed according to the bequests in his 1998 will, under which Cross received the remainder of the estate after the specific distributions.

Cross executed revised wills in 2002 and 2005, each reducing the size of the bequests to Morse's family. In October 2010, Cross executed another revised will that left his entire estate to Herard, with no bequests to any of Morse's family members.[2] Masters drafted all of these wills.

Cross died in 2015, and his October 2010 will was admitted to probate.

---

[2] Cross executed another revised will six days later that made an immaterial correction.

*TEDRA Petition*

Portmann filed a TEDRA petition against Herard, as the personal representative of Cross's estate, to specifically enforce Cross's 1998 will. Portmann alleged that Cross and Morse agreed with each other that if one predeceased the other, the survivor would divide the remainder of the survivor's estate between their two families, and that their 1998 wills were an expression of this agreement. Portmann claimed that the 1998 wills were mutual wills that could not be unilaterally revoked. He sought an order directing Herard to distribute Cross's estate in accordance with the 1998 will.

Herard moved for summary judgment. In support of her motion, Herard presented a declaration by Masters. Masters stated that he discussed the concept of mutual wills with Cross and Morse. He also stated that if Cross and Morse had told him that they wanted a mutual will, he would have included language to that effect in the wills and would not have agreed to draft revised wills for Cross after Morse's death.

Masters further stated:

> After updating their wills several times and hearing their different intentions each time, I am absolutely sure that they did not intend to prepare mutual wills. They were very adamant and it was important to each of them to be free to do as they pleased with their resources – especially after one of them passed away. Neither of them made any statements that they wanted mutual wills or wanted to enter into a contract not to change their wills.

Clerk's Papers (CP) at 112. Masters concluded that "I am sure that Mr. Morse and Mr. Cross never had any intent to lock each other into mutual wills." CP at 113.

In response, Portmann submitted several declarations, including a declaration by Pickle, the husband of Warter's daughter Sherrie (Cross's niece). Pickle stated that he and his wife were close to Cross and Morse, and that Pickle had reviewed Cross's 1998 will. Pickle stated:

In subsequent conversations, [Cross] and [Morse] emphasized to Sherrie and me the fundamental feature of their agreement in their plan: half of the survivor's estate going to the other's family members. Both men told us that this was their agreement.

CP at 254. Pickle concluded that ever since Cross made a new will in January 1998,

[I]t has always been clear in my mind that [Cross] and [Morse] had a well-thought-out end-of-life plan. Each partner would leave his estate to the other, and the survivor would be free to use the money and property as he wished. Upon the survivor's death, the remainder of the estate would be divided in half, with half going to [Morse's] family and half going to [Cross's] family.

CP at 255.

Herard filed a motion to strike Pickle's declaration on the ground that the declaration was inadmissible under RCW 5.60.030, the "deadman's statute." The trial court granted the motion to strike specific paragraphs that contained purported statements of Cross and Morse, ruling that such statements were inadmissible under RCW 5.60.030 and also as hearsay.

The trial court then granted summary judgment in favor of Herard and dismissed Portmann's TEDRA petition. The court subsequently awarded reasonable attorney fees to Herard.

Portmann appeals the trial court's order granting summary judgment.

ANALYSIS

This case involves a narrow issue: whether Cross and Morse entered into an oral agreement to execute mutual wills that became irrevocable when one of them died. If they did, Cross could not change his 1998 will after Morse's death. If they did not, Cross was free to change his 1998 will. Because the trial court granted summary judgment in favor of Herard, the question on appeal is whether there was sufficient evidence to create a genuine issue of material fact regarding the existence of an agreement to execute mutual wills. We hold that the evidence did not show a genuine issue of material fact.

5

A.    STANDARD OF REVIEW

We review a trial court's order granting summary judgment de novo. *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 182, 401 P.3d 468 (2017). We view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). A genuine issue of material fact exists if the evidence is sufficient for a reasonable jury to find in favor of the nonmoving party. *Zonnebloem*, 200 Wn. App. at 182-83. A factual issue may be determined on summary judgment if reasonable minds can reach only one conclusion on that issue. *Id.* at 183.

If a moving defendant shows the absence of any evidence supporting the plaintiff's claim, the burden shifts to the plaintiff to show a genuine issue of material fact. *Id.* To meet this burden, the plaintiff must present specific facts that demonstrate an issue of fact. *Id.* A nonmoving party cannot rely on conclusory statements or conjecture. *Elcon Constr., Inc. v. E. Wash. Univ.*, 174 Wn.2d 157, 169, 273 P.3d 965 (2012).

B.    EXISTENCE OF AGREEMENT TO EXECUTE MUTUAL WILLS

Portmann argues that the trial court erred in granting summary judgment to Herard because Pickle's declaration and all the surrounding circumstances established a genuine issue of material fact as to whether Cross and Morse had an oral agreement to execute mutual wills.

We hold that the trial court properly excluded as hearsay the material portion of Pickle's declaration. And we hold that although the evidence may have shown that Cross had a present intention and plan to devise half of his remaining estate to Morse's family members when he

executed his 1998 will, the evidence did not create a question of fact as to whether Cross and Morse had an actual agreement to execute mutual wills. Therefore, we affirm the trial court.

1. Legal Principles

Mutual wills are two wills that are "executed pursuant to an agreement between two individuals as to the manner of the ultimate disposition of their property after *both* are deceased." *Newell v. Ayers*, 23 Wn. App. 767, 769, 598 P.2d 3 (1979). Mutual wills are created when "two parties make an agreement as to the manner of the disposition of their property after both are deceased and to make mutual wills to carry such agreement into effect." *In re Estate of Richardson*, 11 Wn. App. 758, 760, 525 P.2d 816 (1974) (footnote omitted).

The legal effect of mutual wills is that when one of the individuals dies and the survivor accepts the benefits conferred by the deceased's will, the survivor is bound to dispose of his or her property as previously agreed. *Newell*, 23 Wn. App. at 769. In other words, upon the death of the testator of one mutual will, the agreed distribution in the second mutual will becomes irrevocable.[3] *See Prince v. Prince*, 64 Wash. 552, 557-58, 117 P. 255 (1911). And "[w]hen such contracts exist they impose fixed obligations which will be specifically enforced." *Richardson*, 11 Wn. App. at 760-61.

By contrast, "reciprocal wills" are two wills that are similar or identical but are executed "with no intention that the wills shall be *mutual* in the sense that neither will can be revoked." *Auger v. Shideler*, 23 Wn.2d 505, 509, 161 P.2d 200 (1945). "[R]eciprocal wills, although executed simultaneously, do not in themselves constitute evidence of a contract to execute

---

[3] While both parties are alive, the agreed distribution can be revoked under certain circumstances. *See Allen v. Dillard*, 15 Wn.2d 35, 51, 129 P.2d 813 (1942).

[mutual] wills and keep them in effect." *Dahlgren v. Blomeen*, 49 Wn.2d 47, 50, 298 P.2d 479 (1956).

An agreement to execute mutual wills can be expressed in the wills themselves. *Newell*, 23 Wn. App. at 770; *Richardson*, 11 Wn. App. at 761. Such an agreement also can be oral. *Arnold v. Beckman*, 74 Wn.2d 836, 839-40, 447 P.2d 184 (1968); *see also Cook v. Cook*, 80 Wn.2d 642, 644, 497 P.2d 584 (1972) (stating that an agreement to devise can be oral). Whether the parties entered into an agreement to execute mutual wills generally is a question of fact. *Newell*, 23 Wn. App. at 769.

However, oral agreements to devise "are not favored, are regarded with suspicion, and will be enforced only upon the strongest evidence." *Cook*, 80 Wn.2d at 644. As a result, the Supreme Court has stated that to avoid summary judgment, a party claiming the existence of an agreement to devise must present "substantial evidence objectively manifesting that the decedent recognized the agreement as existing during his lifetime." *Id.* at 646. In addition, the court adopted a "high probability" standard of proof at trial – the evidence must establish to a high probability that the claimed agreement existed. *Id.*

The "high probability" standard applies to the existence of an oral agreement to execute mutual wills. *Newell*, 23 Wn. App. at 769. This standard is the same as the more familiar "clear, cogent, and convincing evidence" standard. *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973).

Where a party is required to prove a fact by clear, cogent, and convincing evidence, we incorporate that standard of proof in our assessment of the evidence on summary judgment. *Kitsap Bank v. Denley*, 177 Wn. App. 559, 569, 312 P.3d 711 (2013). To avoid summary judgment, the nonmoving party must present sufficient evidence to establish with "high

probability" the fact at issue. *Id.* at 569-70; *see also In re Estate of Reilly*, 78 Wn.2d 623, 640, 479 P.2d 1 (1970) (stating that "[e]vidence which is 'substantial' to support a preponderance may not be sufficient to support the clear, cogent, and convincing" standard).

2. Admissibility of Pickle Declaration

Initially, Portmann argues that the trial court erred in striking portions of Pickle's declaration. We hold that to the extent it was offered to establish the existence of an agreement to execute mutual wills, Pickle's statement that Cross and Morse told him that they had agreed to bequeath half of the survivor's remainder estate to the other's family members was inadmissible hearsay.[4]

Evidence offered in opposition to a summary judgment motion must be admissible. *SentinelC3, Inc. v. Hunt*, 181 Wn.2d 127, 141, 331 P.3d 40 (2014). Ordinarily, evidentiary rulings are reviewed for an abuse of discretion. *Mutual of Enumclaw Ins. Co. v. Gregg Roofing, Inc.*, 178 Wn. App. 702, 728, 315 P.3d 1143 (2013). But we review de novo a trial court's evidentiary rulings made in conjunction with a summary judgment motion. *Parks v. Fink*, 173 Wn. App. 366, 375, 293 P.3d 1275 (2013).

Hearsay is defined in ER 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

---

[4] However, the trial court did err in striking portions of Pickle's declaration under RCW 5.60.030, the deadman's statute. RCW 5.60.030 bars the testimony of a "party in interest" – someone who stands to gain or lose in the pending litigation. *In re Estate of Miller*, 134 Wn. App. 885, 893, 143 P.3d 315 (2006). Pickle's wife was a party in interest because she was a successor to Warter, a devisee in Cross's 1998 will. But RCW 5.60.030 would not preclude Pickle from testifying regarding an interest that would be his wife's separate property. *Diel v. Beekman*, 7 Wn. App. 139, 152-53, 499 P.2d 37 (1972), *overruled on other grounds by Chaplin v. Sanders*, 100 Wn.2d 853, 676 P.2d 431 (1984). Under RCW 26.16.010, any property devised to one spouse constitutes separate property. Nevertheless, this error is harmless because the trial court properly excluded the one material portion of Pickle's declaration as hearsay.

asserted." ER 802 states that hearsay is inadmissible unless a specific exception allows it. In paragraph 8 of his declaration, Pickle stated:

> In subsequent conversations, [Cross] and [Morse] emphasized to Sherrie and me the fundamental feature of their agreement in their plan: half of the survivor's estate going to the other's family members. Both men told us that this was their agreement.

CP at 254. This statement clearly was hearsay if Portmann offered it to prove the truth of the matter that Portmann claims Pickle asserted – that Cross and Morse had an agreement to execute mutual wills. As a result, the statement was inadmissible under ER 802 unless a specific exception applies.[5]

Portmann argues that Pickle's declaration was admissible under the exception for state of mind or intent in ER 803(a)(3). ER 803(a)(3) provides an exception for

> [a] statement of the declarant's *then existing state of mind*, emotion, sensation, or physical condition (such as *intent*, *plan*, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

(Emphasis added.)[6]

To the extent that Pickle's statement reflects Cross's and Morse's state of mind – their existing intent and plan that if one predeceased the other, half of the survivor's remainder estate would be bequeathed to the other's family members – ER 803(a)(3) applies. But whether Cross

_____

[5] Other hearsay statements in Pickle's declaration included Cross and Morse telling Pickle that Herard had questioned Cross about his will , that they were upset by Herard's probing , and that they wanted nobody to frustrate their estate plans. We do not address the admissibility of these statements because they were not material to whether Cross and Morse had an oral agreement to execute mutual wills.

[6] The clause that expressly addresses certain issues regarding a will is inapplicable here because the "execution, revocation, identification, or terms" of Cross's will are not at issue. The issue is the existence of an oral agreement to execute mutual wills.

and Morse *intended* to enter into an agreement is not the issue here. Portmann was required to produce evidence that they *actually* entered into an agreement to execute mutual wills. Therefore, if Pickle's statement was admissible under ER 803(a)(3) it would not be sufficient to create a genuine issue of *material* fact.

The material issue here is whether Cross and Morse actually entered into an agreement to execute mutual wills. ER 803(a)(3) does not apply to Pickle's statement that Cross and Morse told him that they had an agreement to distribute their estates if offered to prove the existence of such an agreement. The *existence of an agreement* does not involve Cross's or Morse's existing state of mind, intent, or plan.

Accordingly, we hold that although paragraph 8 of Pickle's declaration may have been admissible under ER 803(a)(3) to show Cross's and Morse's intent, that paragraph was inadmissible hearsay regarding the existence of an agreement to execute mutual wills.

3.    Mutual Will Analysis

Portmann argues that several pieces of evidence created a genuine issue of fact precluding summary judgment. But particularly under the high probability standard, this evidence does not create a genuine issue of fact on the only *material* issue – whether Cross and Morse actually had an agreement to execute irrevocable mutual wills that would distribute half of the survivor's residual estate to the other's family members.

First, Portmann argues that Pickle's declaration establishes that Cross and Morse had an agreement to execute mutual wills. As stated above, we hold that Pickle's statement that Cross and Morse told him that they had an agreement regarding the distribution of their estates is inadmissible hearsay to the extent offered to prove the existence of a prior agreement to execute mutual wills. And although Pickle's statements may be admissible to show Cross's and Morse's

11

intent, an intent to devise their estates in a certain manner is not sufficient to create a genuine issue of fact that they actually entered into an agreement to execute mutual wills.

In any event, Pickle's statement regarding an "agreement" provided evidence only that Cross and Morse had an agreement to distribute their estates, not that they had an agreement to execute irrevocable mutual wills.

The other statements Pickle recounts are not material to this issue. Pickle's claim that "it has always been clear in my mind" that Cross and Morse had a plan to have the survivor distribute half of the remainder of his estate to the other's family members, does not create a genuine issue of material fact. CP at 255. What Pickle *believed* is not relevant to whether Cross and Morse actually had an agreement to execute mutual wills.

Second, Portmann argues that the similarity between Cross's will and Morse's will supported a reasonable inference that they were mutual wills. However, although similar wills could be mutual wills, they also could be nonbinding reciprocal wills. *See Dahlgren*, 49 Wn.2d at 50; *Auger*, 23 Wn.2d at 509. The difference between the two kinds of wills is that mutual wills require the existence of an agreement as to the manner of the disposition of their property after both are deceased. *Newell*, 23 Wn. App. at 769. The existence of such an agreement cannot be inferred solely from the similarity of the wills. *Dahlgren*, 49 Wn.2d at 50 (stating that "reciprocal wills, although executed simultaneously, do not in themselves constitute evidence of a contract to execute such wills and keep them in effect.").

Third, Portmann argues that the fact that both 1998 wills contained separate provisions that would be invoked only if the other died first showed that Cross and Morse intended their wills to be mutual. He claims that if the parties had not agreed to mutual wills, these provisions would be superfluous. But these provisions show only the intent of both Cross and Morse in

1998 that half of the survivor's residual estate would be distributed to the other's family members. They do not show whether Cross and Morse had entered into an agreement to execute mutual wills to implement that intent. *See Cook*, 80 Wn.2d at 648 (stating that the testator's statements were "just as readily explained as an expression of his then intentions, rather than as a recognition of an existing agreement").

Fourth, Portmann argues that the existence of an agreement to execute mutual wills was supported by the growing relationship between Cross and Morse, the increasing interaction with each other's families, and the trend of their 1992, 1995, and 1998 wills. These circumstances might reflect the intent of Cross and Morse in 1998 that half of the survivor's residual estate would be distributed to the other's family members. But they do not show whether Cross and Morse had entered into an agreement to execute mutual wills.

Fifth, Portmann argues that the fact that Cross and Morse had started owning property as joint tenants with right of survivorship rather than tenants in common created an inference that this new ownership structure was partial consideration for an agreement to execute mutual wills. Although this development technically could constitute consideration for an agreement, it does not show whether Cross and Morse in fact entered into an agreement to execute mutual wills.

Sixth, Portmann argues that the fact that Cross left some money to Morse's family members in his 2002 and 2005 wills before leaving them out of his 2010 wills shows that Cross recognized some legal obligation to Morse. But this argument is nothing more than speculation. At most, the provisions of Cross's 2002 and 2005 wills showed his intent at that time to distribute some of his estate to Morse's family members.

None of Portmann's evidence creates a genuine issue of fact that Cross and Morse had an agreement to execute mutual wills that would distribute half of the survivor's residual estate to

13

the other's family members under a preponderance of the evidence standard, much less under the highly probable standard. The evidence shows only that both Cross and Morse had the intent in 1998 to provide for such a distribution.

Further, other strong evidence shows that Cross and Morse did not have an agreement to execute mutual wills. Their wills did not include any provisions stating that they were mutual wills or that they were irrevocable upon the first death. The wills were not executed at the same time; Morse declined to sign a revised will when Cross did sign a revised will and Morse finally signed a different will nine months later. And Masters emphasized that if Cross and Morse had told him that they wanted a mutual will, he would have included language to that effect in the wills and would not have agreed to draft revised wills for Cross after Morse's death.

Portmann submitted evidence showing that Cross and Morse may have had an intent in 1998 that the survivor would leave half of his residual estate to the other's family members. But Portmann's evidence did not create a genuine issue of fact under the high probability standard that Cross and Morse actually entered into an agreement to execute mutual wills to implement that intent. Accordingly, we hold that the trial court did not err in granting summary judgment in favor of Herard.[7]

C.    ATTORNEY FEES ON APPEAL

Herard requests that we award reasonable attorney fees to her on appeal. RCW 11.96A.150(1) states that an appellate court, in its discretion, may award attorney fees to any party "in such amount and in such manner as the court determines to be equitable" based on "any

---

[7] Portmann also requests that we vacate the trial court's award of attorney fees to Herard. But he does not claim that the trial court erred in awarding attorney fees if summary judgment was proper. Therefore, we need not address this issue.

and all factors that it deems to be relevant and appropriate." This statute gives an appellate court broad discretion regarding the award of attorney fees in relation to the resolution of trust and estate disputes. *In re Estate of Mower*, 193 Wn. App. 706, 727, 374 P.3d 180, *review denied*, 186 Wn.2d 1031 (2016).

Portmann challenged a facially valid will based on an allegation that Cross and Morse agreed to execute mutual wills even though oral agreements to devise "are not favored, are regarded with suspicion, and will be enforced only upon the strongest evidence." *Cook*, 80 Wn.2d at 644. Portmann presented no such evidence. Accordingly, we exercise our discretion and award attorney fees on appeal to Herard.

CONCLUSION

We affirm the trial court's order granting summary judgment in favor of Herard. In addition, we award attorney fees on appeal to Herard under RCW 11.96A.150.

_____
MAXA, A.C.J.


We concur:

_____
JOHANSON, J.

_____
SUTTON, J.

15