[No. 29661. Department One. August 3, 1945.]

FLORENCE HORCH AUGER *et al., Respondents,* v. ANNA SHIDELER, *Individually and as Executrix, Appellant.*[1]

---

[1]Reported in 161 P. (2d) 200.

*George H. Freese* and *C. E. H. Maloy,* for appellant.

*Edward G. Cross,* for respondents.

GRADY, J.—This action was brought by Florence Horch Auger, Floyd Horch, and Lucille Horch Warren against Anna Shideler, individually and as executrix of the will of August Horch, deceased, Marie Irwin and Mollie Pettijohn to secure a decree of the court that each of them was the owner of an undivided one-twelfth interest in all of the property belonging to the estate of August Horch, deceased, then in the process of administration. A trial was had, resulting in such a decree, from which Anna Shideler, individually and as executrix of the will of the decedent, has taken this appeal.

On and prior to January 27, 1928, August Horch and Marie Horch, husband and wife, were residents of Adams county, Washington. On that date they were of the ages of seventy and fifty-nine years, respectively. They had been engaged in farming operations and had accumulated a substantial amount of community property. They had three adult daughters, who are the defendants. There was also a deceased son, August Horch, Jr., who left the plaintiffs surviving him. Mr. and Mrs. Horch were not educated people. They could understand and speak the English language to some extent, but were better versed in the German language. They had discussed between themselves how they desired to dispose of their property in the event of death, but had never made any wills.

These facts are not in dispute, and there is no conflict with reference to any inferences that may be legitimately drawn from them in connection with what transpired relative to the making of their wills.

The evidence in the case consisted of the deposition of Richard B. Ott, the testimony of Philip Pfeifer and the

defendant Marie Irwin, called as an adverse witness, and some documentary evidence. No findings of fact were made by the court, but the trial judge filed a memorandum decision, which is in the statement of facts.

■ The appellant suggests that, as the principally decisive factors of the case are derived from the deposition of Richard B. Ott, we should in our review of the record consider the evidence independent of any finding or conclusion made or reached by the trial court, weigh it all, draw our own inferences from it and all of the surrounding circumstances, and determine therefrom what findings and decision should have been made. We accept this suggestion and shall make our approach to the record accordingly.

■ We shall also adopt the strongest rule suggested by our decisions that, in a case of this kind, the proof of an agreement for the disposition of property after death and to make mutual wills must be by evidence which is conclusive, definite, certain, and beyond all legitimate controversy.

On January 27, 1928, Mr. and Mrs. Horch came to the office of Richard B. Ott, an attorney at law, and informed him that they had made an agreement relative to the disposition they wanted to make of their property in the event of their death and had agreed to make their wills. They sought information from him as to the effect of the wills which they made known to him they had in mind. Mr. Ott explained to them the meaning and effect of mutual wills.

It appeared from their conversation that they had three grandchildren whose parents were deceased and they desired that the share of their property that their deceased son would have received should go to his three children; that they desired the balance of their property be given to their three living children in equal shares, and that the survivor of them should have a life estate in the property of the other contingent upon remaining unmarried, and in the event of marriage the community interest of the one deceased should then vest in the children and grandchildren named in the shares provided. Mrs. Horch made

known her desire to give the deceased son's share to his children, to which Mr. Horch assented, and from what was said it was made clear to Mr. Ott that unless this was to be the effect of her will she would not make one.

The conversation made it clear also that the manner of the disposition of their property had been talked over and mutually agreed upon before consulting Mr. Ott. They wanted similar wills, and when they learned from Mr. Ott that what he termed "mutual" wills meant that neither will could be changed except by consent of both parties and that their agreement would be binding on both of them if no change was made prior to the death of one or the other, they both then made known to Mr. Ott that such were the kind of wills they desired. They did not use the word "mutual" when referring to their wills, but it is very clear that, when they told Mr. Ott what their agreement was, it appeared they wanted mutual wills, and they both confirmed this when the effect of mutual wills was explained to them by him.

Mr. Ott then prepared the wills. Before the wills were executed, Mr. Ott read over each will, a paragraph at a time, and then translated what he had read into the German language. Mr. Pfeifer, a brother of Mrs. Horch, was present. He looked over the wills to see if they were alike. After this was done, Mr. and Mrs. Horch stated the wills were in accordance with their previous agreement, and they were then executed in the presence of witnesses.

About all that can be gathered from the testimony of Mr. Pfeifer is that Mr. and Mrs. Horch had told him that when they made their wills they wanted him to be a witness to them; that he went with them to Mr. Ott's office, and they told Mr. Ott they had agreed to make their wills and what they wanted put in them and the shares of the property they wanted their children and grandchildren to have; that Mr. Ott explained to them the effect of the wills; that the wills were prepared by Mr. Ott, read over by him in English and then translated into German, and Mr. and Mrs. Horch said that was the way they wanted them; that he looked the wills over to see that they were alike.

Marie Irwin stated that she had heard her mother say the things related by Mr. Ott in his deposition about the agreement between her parents as to how they wanted to dispose of their property; also that her mother was very insistent that the grandchildren should receive a one-fourth share of the entire property; that she had made such statements in the presence of her husband and he had assented to that being done.

The appellant asserts that, in order to meet the test of "clear, definite, cogent, and convincing evidence and beyond all legitimate controversy" such evidence must be free from suspicious circumstances, inconsistency, contradictions, and inherent improbabilities, and in this case the test has not been met.

We recognize what we believe has been the experience of lawyers generally when preparing wills for husbands and wives that, as a rule, they desire *reciprocal* wills, in which they devise and bequeath their property to each other, trusting to the survivor to make provisions for children or other objects of their bounty, with no intention that the wills shall be *mutual* in the sense that neither will can be revoked without the consent of the other, or after the death of the other spouse; but occasionally they do desire *mutual* wills which will have that effect.

We think it was just such a situation that was presented to Mr. Ott when he heard these unlettered people explain what they had in mind and what they had agreed upon so that the grandchildren should have one fourth of their community property; that each of their children should have one fourth thereof; that the survivor should have a life estate in the community interest of the other; and in the event of remarriage of the survivor the life estate should terminate. This situation could not have been made known to Mr. Ott unless the parties had reached such an agreement. They wanted to find out from Mr. Ott what kind of a will each would have to make in order to bring about their ultimate desires. He at once realized the ordinary reciprocal wills would not meet their agreement and their desires, so he explained to them the legal effect

of mutual wills was that such wills could not be changed while they both lived except by consent of both of them, and that, if no such change was made, then the survivor could not make any change in his or her will. The explanation made fitted exactly what Mr. and Mrs. Horch had in mind and what they had talked over and agreed upon. They had the wills prepared accordingly.

It is true that, in giving his testimony, Mr. Ott, on some occasions, used the expressions "I think" and "it is my opinion," but in each instance either an objection was made or examining counsel reframed the question so that the witness, by his final answer, testified to facts and did not give mere conclusions. Also it appears that (as is frequently the case) whatever was objectionable as to the form of the answers to questions was cleared up on cross-examination.

It is urged that events occurring subsequent to the making of the wills and the part played by Mr. Ott reflect upon his testimony and the accuracy of his recollection as to what actually occurred at the time he prepared the wills. It is also argued that, if Mr. and Mrs. Horch had agreed to make mutual wills, Mr. Ott would have had each will contain recitals so that such effect would appear upon their face. No doubt such recitals would have clarified the situation and perhaps made this litigation unnecessary; and while this is a factor to be given consideration, it is by no means conclusive and does not prevent the wills being mutual ones if it is made clear by the evidence that such was the intention of the parties.

It is also urged the testimony of Mr. Ott lacks force because he did not testify to any terms, conditions or any consideration passing between Mr. and Mrs. Horch for the making of mutual wills, nor to any fact evidencing a meeting of the minds of the parties that such wills were made pursuant to any agreement for the making of them. As we interpret Mr. Ott's testimony, he did make very clear the fact that these people in their way of speaking and explaining made known that they had agreed upon the ultimate disposition of their property and in such a way as to

enable him to know that they wanted to make mutual wills. In this manner the terms of their agreement were outlined. The mutual promises would constitute the consideration for the agreement, and the making of each will would be the consideration for the making of the other. Mr. Ott's testimony shows clearly that the minds of the parties had met as to the disposition of their property, and there is no room for doubt that the wills were made pursuant to their agreement.

It was not necessary that Mr. and Mrs. Horch use the word "mutual" when making known to Mr. Ott the kind of wills they wanted and the effect they desired them to have. They would have no knowledge of the distinction between a mutual will and just merely a reciprocal will. They used simple words indicating that they not only wanted wills that would be just alike, in that each would devise and bequeath his or her community property in the same way, but the whole explanation as to their agreement led to no other conclusion than what they had in mind was *mutual* wills as that term is legally understood. The fact that they desired to have their grandchildren ultimately acquire the one-fourth interest that would have been the share of their deceased son by inheritance, and without which arrangement Mrs. Horch would not have made a will, together with the life estate plan and the termination of the life estate upon remarriage, is inconsistent with the idea of mere reciprocal wills, but are highly persuasive facts in reaching the conclusion that mutual wills had been agreed upon and had been intended.

It is urged that the present recollection of Mr. Ott must be regarded with suspicion because, some years later when Mrs. Horch died, he was attorney for the husband executor and conducted the probate proceedings and then advised Mr. Horch that, as his wife had been named as executrix of his will, it would be necessary for him to change it, and after a lapse of some time he prepared a will for Mr. Horch in which all of his property was left to his three surviving children and the grandchildren were given only nominal bequests. It is also argued that, if the kind of agreement

Mr. Ott testified to had been made by Mr. and Mrs. Horch in 1928, he would have remembered it and advised Mr. Horch that he could not change his will.

These arguments are worthy of very careful consideration, but the situation was open to explanation; and this was made by Mr. Ott when he stated that Mr. Horch did not bring the will to his office when he had the later one prepared, and that while Mr. Ott realized that a change would have to be made as to who should be the executor or executrix in view of the death of Mrs. Horch, he did not then have in mind the fact that a number of years before the parties had made an agreement to have mutual wills. We think it only natural that Mr. Ott would not remember the making of mutual wills unless and until something transpired to carry his recollection back and cause him to focus his mind upon that subject. We find no such inconsistency as to indicate that Mr. Ott was not testifying to and giving his recollection as to what transpired when the wills were made in 1928. It appears very clear to us that, when the occasion arose for him to refresh his memory and give his recollection, the actual facts came back to him and he was able to portray them as they occurred.

There is nothing in the testimony that has caused us to feel or even suspect that anyone has done or attempted to do anything other than to portray the true facts to the court. The witnesses stated the things about which they had testimonial knowledge in a clear and straightforward manner. A consistent chain of events and circumstances have been set forth and a situation was presented which impresses us as being highly probable and one which people situated as Mr. and Mrs. Horch were would be very likely to create.

Viewing, weighing, and considering the evidence as a whole, and drawing the inferences we deem justifiable and proper, we find that it meets the prescribed test and warrants and requires a finding to be made that Mr. and Mrs. Horch, prior to the time of making their wills, had

an agreement as to the disposition of their property and to make wills carrying their agreement into effect.

 Under the facts as we find them to be, we need not consider the cases cited bearing upon the question of whether either Mr. or Mrs. Horch could have legally revoked their wills prior to his or her death, as there was no such revocation attempted and that question is not before us. We have the situation where, upon the death of Mrs. Horch, Mr. Horch caused her will to be probated and accepted and received the benefits conferred upon him therein. Under such circumstances, the rule of law applicable is that, when a husband and wife make an agreement as to the manner of the disposition of their property after both are deceased and to make mutual wills to carry such agreement into effect, and thereafter make such wills, if the surviving spouse causes the will of the decedent to be admitted to probate, the estate administered upon, and accepts the benefits conferred upon him by such will, he is deemed to have elected to take under the agreement and will and cannot thereafter free himself from the obligations created thereby. *Prince v. Prince*, 64 Wash. 552, 117 Pac. 255; *Cummings v. Sherman*, 16 Wn. (2d) 88, 132 P. (2d) 998.

The judgment is affirmed.

BEALS, C. J., STEINERT, and JEFFERS, JJ., concur.

MILLARD, J. (dissenting)—I cannot agree with argument of counsel for respondents, and the implication in the majority opinion, that testimony of Marie Irwin and Philip Pfeifer was corroborative. Marie Irwin testified that, on or about the date the will was executed and some time subsequently, it was the desire of her parents that the grandchildren (respondents) receive their father's portion of the estate. As to this there is not, of course, any dispute. In similar wills the husband and wife provided for that disposition of the property; however, that did not divest either of the right to change his or her mind. They had the right to change their minds before they died. There is nothing in the testimony of Marie Irwin from which it may

be reasonably inferred that either August Horch or Marie stated they had an agreement or understanding to make mutual wills or that they understood that they could not, after the death of the other, change his or her will.

That the testimony of Pfeifer is not corroborative, is clear to anyone sufficiently industrious to read that testimony.

I have always appraised Mr. Ott as a competent, ethical lawyer. It should be conclusively presumed that he knew what he was doing when drafting the two wills. With knowledge of the great amount of litigation in the courts respecting oral promises to make mutual wills, would he not, in order to clearly effectuate the purpose of his two clients, have made clear statements in the wills which would have obviated necessity of resort to the courts? "Actions speak louder than words." The fact that he did not do so and the further important fact that, after the wife's death, he probated her estate and drafted a different will for the husband, were circumstances or acts *ante litem motam,* hence more cogent and convincing than his qualified statements *post litem motam.*

To hold that Mr. Ott knew that the parties desired to make mutual wills, is to charge him with unprofessional conduct. If he drafted the two wills with knowledge that they were mutual wills, why did he probate the estate of the wife and after her death draft the husband's will (one now in controversy), the terms of which are inconsistent with his former will, which made the same disposition of his property as the wife's will made of her property?

In the majority opinion, it is stated:

"Viewing, weighing, and considering the evidence as a whole, and drawing the inferences we deem justifiable and proper, we find that it meets the prescribed test and warrants and requires a finding to be made that Mr. and Mrs. Horch prior to the time of making their wills had an agreement as to the disposition of their property and to make wills carrying their agreement into effect."

The record refutes the foregoing. There is absolutely no credible evidence from which it may be inferred that

515

Mr. and Mrs. Horch had, at the time Mr. Ott drafted the two wills, any intention of making mutual wills, nor is there any credible evidence that Mr. Ott understood they had such intention. That the decree is erroneous is clear in the light of the testimony and conduct of Mr. Ott, who drafted the two wills, probated the wife's estate, and drafted another will for the surviving husband.

The respondents failed to sustain the burden of proof of an oral agreement of Mr. and Mrs. Horch to make mutual wills, therefore the decree should be reversed.

