[No. 36917.   En Banc.   February 25, 1965.]

STANLEY BICKNELL, *Respondent and Cross-appellant,* v.
CLARENCE GUENTHER, *as Administrator, Appellant.**

*J. D. Searle* and *Hull, Armstrong & Vander Stoep,* for
appellant.

*Donal D. Sherfy,* for respondent and cross-appellant.

DONWORTH, J.—This action was brought for specific per-
formance of an alleged oral contract wherein plaintiff
would perform work and services on decedent's farm and
she, in turn, would devise all of her property to him. The
defendant is the administrator of her estate. Both parties

*Reported in 399 P. (2d) 598.

are appealing and will be designated by their titles in the original action.

The evidence shows that plaintiff had worked as a logger from 1930 to 1937. He had known the decedent and her husband for several years and owned a 40-acre tract adjoining theirs. The husband of decedent died in March, 1937. The plaintiff went to work for her on April 9, 1937, and worked regularly on her farm until June, 1961, when she died.

Nine witnesses all testified that they had known the decedent from 8 to 50 years. They had lived as neighbors and had had many conversations with her about her property and her relations with plaintiff. Their testimony was undisputed.

In 1949 and 1958, respectively, plaintiff built a machine shop and a lower barn on decedent's property. These were substantial permanent buildings with concrete foundations, sheet metal roofs, and frames of rough boards sawed in plaintiff's own mill. The testimony was that when these were being erected, decedent had stated:

" ' . . . What is the use of having it down there? [Meaning on decedent's farm] . . . he is putting it there because it [the farm] will be his when I am through with the place. He is going to have all of this anyway, and he wants all of these buildings together. . . . He has worked and stood by me all these years, and more than earned anything that I could leave him on this property . . . This farm, the property, is his when I pass on. He has earned it three times over. . . .' "

Plaintiff testified that, for 7 years prior to 1937, he had worked as a logger for $5.60 a day. When he went to work for decedent, he received $45 a month and room and board for 3 months. His wages were then reduced to $15 a month until October, 1942, when mortgages on the property were paid off. Thereafter, he received $45 a month until 1961, when he received one half of the net income from the farm until she died in June, 1961.

The testimony concerning these mortgages was that decedent had stated that the only one who helped her was Stanley (plaintiff) and that he worked with her until

they got out of debt; if it hadn't been for him she never would have maintained the farm, and that is why she wanted to leave it to him. " 'It is his. I am giving it to him. . . . He has earned it, the long hours he has put in.' "

There was testimony that plaintiff's relationship with decedent was much more than the usual employer-employee relation. He was treated as one of the family, and performed many more duties than those normally required of a farm laborer. Several witnesses testified that plaintiff had worked on the farm from early morning until late at night, week ends included, and, with minor exceptions, had taken no vacations. He furnished his own automobiles for transportation for decedent and her family from 1937 to 1944, and again from August, 1960, until the time of her death.

Plaintiff offered in evidence an unsigned will form in which decedent, in her own handwriting, had first made nominal bequests to relatives (several of whom predeceased her), and then provided:

"Fifth, to Stanley Bicknell, Executor for faithful services, since 1937 All other Personal Property and Realestate, Stocks and Money inherited or otherwise.

"Should said, Executor be deceased at my death, his said inheritance shall go to The Children's Orthopedic Hospital, Seattle, Washington."

This had been discovered in a bedroom in her house a few months after her death.

There was also testimony that a "Memo" in decedent's handwriting was found a few days after her funeral. It stated:

"Stanley shall have the use of my property and the proceeds thereof until his death, after which it will go to the Orthopedic Hospital."

Defendant's wife found this memorandum in the presence of both plaintiff and defendant. However, it was not introduced into evidence and no one testified as to what became of it. Defendant testified that it had been shown and delivered to plaintiff soon after it was found.

The testimony offered by the defendant was rather brief and did not conflict with that of plaintiff's witnesses.

After the trial, the court decreed specific performance of the alleged oral contract whereby plaintiff received the real property and personal property appurtenant to the farm, but denied specific performance as to the remainder of the estate, consisting of bank accounts and shares of dairy stock.

Defendant appealed from the award of any property to plaintiff. Plaintiff has cross-appealed, assigning error to the court's award of the bank accounts and stock to defendant and in refusing to permit plaintiff to testify concerning certain matters which are discussed fully below in connection with the cross-appeal.

The defendant's first 10 assignments of error are based upon the findings of the trial court that an implied contract was entered into whereby the decedent agreed to devise and bequeath certain property to plaintiff in consideration of services to be performed by him as agreed.

The trial court's findings of fact relative to the alleged oral contract and decedent's breach thereof are as follows:

"III. Plaintiff, Stanley Bicknell and Sarah Ann Guenther, during the lifetime of Sarah Ann Guenther, entered into a contract and agreement, express or implied, in which it was agreed that Stanley Bicknell would perform many and varied services for Sarah Ann Guenther; and Sarah Ann Guenther promised and agreed to devise and bequeath certain of her property to Stanley Bicknell in consideration of the performance of said contract by Stanley Bicknell. This contract was accepted by the plaintiff and Sarah Ann Guenther.

"IV. Pursuant to and in reliance on said contract and by virtue of the terms thereof and in performance thereof, Stanley Bicknell did remain on said farm (the real estate referred to herein) and belonging to Sarah Ann Guenther and performed his obligations as required in said contract, since April 1937, and Stanley Bicknell did remain on said farm until after June 4, 1961.

"V. Since 1937, and pursuant to the terms of said contract, the income from the labors and services of Stanley Bicknell were used to pay off the encumbrance on said farm and to generally improve said farm, buy equipment,

livestock and generally contribute to the expenses of the operation of said farm. Plaintiff accepted a diminished wage during the later months of 1937 and until the mortgage on the farm referred to herein was paid off in 1942.

"VI. Plaintiff performed many and varied services including but not limited to furnishing transportation to and for Sarah Ann Guenther, and nursing care and personal services for Sarah Ann Guenther's father, Abe Amstutz; plaintiff worked steadily long hours and worked exceptionally hard; plaintiff took one vacation that amounted to anything, from 1937 to 1941[1]; all of this conduct by the plaintiff was not the normal conduct of a person working for wages only.

"VII. Sarah Ann Guenther induced plaintiff to build a machine shop and another building referred to as the 'lower barn' on plaintiff's [sic] [decedent's] property. These buildings were of substantial size and value. Sarah Ann Guenther dissuaded plaintiff from building these buildings on plaintiff's own real estate which was located adjacent to the farm referred to herein.

"VIII. The deceased Sarah Ann Guenther had no obligation to support any of her relatives referred to in this matter.

"IX. No Will has been admitted to probate and plaintiff and defendant have been unable to locate any Last Will and Testament of Sarah Ann Guenther, although the parties hereto have made diligent search for said Will. By reason of no Will having been made, Sarah Ann Guenther broke, breached and failed to perform the terms and conditions and duties imposed upon her by said contract and agreement referred to herein."

Defendant has argued these assignments together under these headings: (A) Was there a contract? (B) Which property did it cover? (C) Does the evidence justify specific performance?

If the answer to the first question is in the negative, we need not consider the other two questions.

Assignments of error No. 11 and No. 12 deal with the admission of the evidence of the two mortgages and their

---

[1]Apparently the figure "1941" resulted from a typographical error and should be read as "1961."

satisfactions and testimony concerning wages paid by decedent to the plaintiff.

The trial court, in its oral decision, said:

"There seems to be just one question in this case, and that is whether there was a contract or not, and there certainly is no proof of an express contract. That is, no one heard the parties actually make an agreement, and, therefore, the problem is whether the evidence clearly shows that such a contract existed, express or implied.

" . . .

"I feel that the evidence overwhelmingly supports the Plaintiff's contention that there is a contract to convey or will the tangible assets, real property, farm equipment, farm machinery, any hay crop that was present, farm animals, the personal and real property."

It is apparent, from reading the trial court's findings in the light of the above-quoted portions of its oral opinion at the close of the trial, that the court found that there was no *express* contract between plaintiff and the decedent relative to devising and bequeathing to him her farm and the personal property situated thereon at the time of her death. Therefore, the first question to be decided is whether, under the rule laid down by this court in *Jennings v. D'Hooghe*, 25 Wn. (2d) 702, 172 P. (2d) 189 (1946), plaintiff has sustained the burden of proving an implied contract by evidence that was conclusive, definite, certain, and beyond all legitimate controversy.

We have set forth rather fully the substance of the evidence produced by plaintiff. As stated above, there was no conflict in the testimony presented by the parties as to the material facts.

■ In the usual case tried to the court, we accept the findings of fact as verities if there is substantial evidence (as compared to a mere scintilla) to support them. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn. (2d) 570, 343 P. (2d) 183 (1959). In the case at bar, and in similar cases involving an oral contract to devise or bequeath the property, under the rule of the *Jennings* case, we have a duty to determine whether the existence of such alleged contract has been proven definitely, certainly, conclusively,

and beyond all legitimate controversy. We are of the opinion that plaintiff has failed to sustain this burden of proof, which is heavier because of the nature of the contract and of this court's skeptical view of such agreements. In *Jennings v. D'Hooghe, supra,* we stated the applicable rule, at p. 704:

"Cases of this kind are not favored and, when the promise rests in parol, are even regarded with suspicion, and will not be enforced except upon the strongest evidence that it was founded upon a valuable consideration and deliberately entered into by the deceased. *Alexander v. Lewes,* 104 Wash. 32, 175 Pac. 572."

█ Contrary to the trial court's statement in its oral decision that the evidence "overwhelmingly supports" the plaintiff's contention "that such a contract existed," we are of the opinion that the proof of the existence of such contract failed to meet the test adopted in the *Jennings* case for the following reasons:

In the first place, there was no evidence as to *when* this alleged contract was entered into. Finding No. 3 recites that it was made between the parties "during the lifetime of" the decedent. Did the parties make the contract in April, 1937, when plaintiff started to work on the farm? It might be reasonably inferred that it was made later, although, in finding No. 4, it is stated that, in reliance on the contract, and in performance thereof, plaintiff did "remain" on the farm and performed his obligations thereunder from April, 1937, until after June 4, 1961 (the date of decedent's death). The findings fail to state what compensation plaintiff received for his services during the 24 years he worked on the farm, other than the decedent's promise to devise the farm to him. The undisputed evidence is that he received $45 per month plus board and room, except for a 5-year period beginning about July, 1937, during which his wages were reduced to $15 per month. Finding No. 5 states that, pursuant to the contract, the income from the labor and services of plaintiff was used to pay off the encumbrances on the farm and to generally improve the farm, buy equipment and livestock, and contribute to the expenses of

the operation thereof. This finding can refer only to the 5-year period above mentioned.

The evidence of the decedent's promise to will the farm to plaintiff consists of the testimony of several witnesses as to conversations with the decedent in which she made statements such as, "I have turned everything over to Stanley"; "It is all his anyway"; "This farm, the property, is his when I pass on." Also, she made other similar statements.

Concerning such statements, we said, in the *Jennings* case, at p. 724:

"The evidence to support alleged contracts in the second class of cases is like that in the case at bar. That evidence consisted for the main part of testimony of witnesses as to statements made by deceased that he expected to leave his property to another. Expressions, '——————— has been good to me, and I will leave my property to him. When I die he will receive everything. If anything happens to me ——————— will receive everything,' do not prove the making of a contract, nor does it indicate any of the terms of a contract."

After the death of the decedent, plaintiff filed a claim against her estate for services rendered in the amount of $304.35. This was paid.

July 12, 1962, the present action was commenced. This was more than a year after the decedent's death.

The law applicable to this case is discussed exhaustively in the *Jennings* case, *supra*, where this court, in an en banc decision, reviewed its prior decisions and stated, at p. 708:

"The pertinent part of Mr. Ellison's testimony with reference to what Mr. Tonjum would do is summed up in the quoted portion of his testimony:

" ' If Mr. Jennings would take care of his home, take care of the grounds, and wash his clothes, and take care of the property, and look after him while he was sick, that he wanted him to have everything that he owned, that he did not want his relatives to have anything.'

"This court has decided thirty-seven cases relative to oral contracts to make mutual wills, or wills in consideration of services to be rendered. In twelve cases we have held

the contracts to be valid and in twenty-five cases enforcement of the alleged contracts has been denied. In order to show that the facts in the instant case are alike to those in the last-mentioned cases and dissimilar to those in the first class of cases, we set out the principal facts in all of them."

The record shows that plaintiff worked long hours daily on the decedent's farm for 24 years prior to her death for $45 per month plus board and room (except for a period of 5 years when his salary was reduced to $15 per month). It further shows that the decedent was pleased with his services, and, on several occasions, stated to her neighbors her intention to leave him the farm upon her death. There is some disparity in the evidence as to whether this intention was to leave him a life estate or the fee interest therein.

Whatever her *intention* was in this regard, plaintiff has not sustained the burden of proving the existence of any contract (express or implied) to devise the farm to him by evidence that was conclusive, definite, certain, and beyond all legitimate controversy. Our decision in the *Jennings* case is still the law as to the quantum of proof required in such cases and should control.

Referring to the trial court's finding No. 6 (above quoted), in which additional services performed by plaintiff are described such as nursing care and personal services for decedent's sick father, and occasionally furnishing her transportation, in our opinion, there is not even a scintilla of evidence that these services were performed under a contract. Plaintiff was employed as a farm hand at $45 per month plus room and board. Any nursing care performed by plaintiff for either decedent's father or her two daughters (one of whom had a heart condition) was performed as a volunteer.

This case does not involve quantum meruit or a quasi-contract. Whether, as a farm hand, plaintiff was overworked or underpaid during the 24 years he worked on decedent's farm is immaterial. He performed valuable services and received the compensation agreed upon by the parties. In the absence of the requisite proof of the existence of a

contract to devise the farm to him, neither law nor equity can now make such a contract for the parties, no matter how strongly the court may feel that as an abstract concept of natural justice he should have been given the farm and contents.

What this court said in *Blodgett v. Lowe,* 24 Wn. (2d) 931, 167 P. (2d) 997 (1946), in which the claimant had lived in the decedent's home for 23 years prior to her death, and, during that time, had cooked, washed, ironed, driven her car, and taken care of her yard, is applicable to this case. The claimant sought specific performance of an alleged agreement by decedent to give him all her property at her death. We there said, at p. 938:

"We are unable to see how a trial court could pass upon whether or not certain acts of one asserting such a contract were relevant or material, unless and until it was shown by competent evidence that there was such a contract, and the terms and conditions of such contract disclosed.

"We are of the opinion the instant case is typical of the situation last above referred to. While we are of the opinion the services performed by appellant in and around the home of Mrs. Buroker might have afforded ample consideration for an agreement, how was it possible for the trial court to say that the services performed by appellant were the services contemplated by the agreement, until an agreement was shown to have been made?

"We are clearly of the opinion that the evidence in this case wholly fails to show that deceased ever made or entered into a contract with appellant, such as alleged. This being true, it follows that the evidence wholly fails to show that the services performed by appellant were so performed in reliance upon the alleged contract.

"All the testimony of the several witnesses who testified in this case shows, is that Mrs. Buroker indicated that she intended to make some provision for appellant upon her death, because he had been good to her, but no witness testified that deceased made any statement directly or to the effect that any provision to be made by her for appellant was based upon any agreement, or the terms of any agreement, or specifically, because appellant was to take care of her for the balance of her life."

Plaintiff relies on *Ellis v. Wadleigh,* 27 Wn. (2d) 941, 182 P. (2d) 49 (1947), and contends that this decision is

in some respects inconsistent with our en banc decision in the *Jennings* case. In *Ellis*, it was established by clear, cogent, and convincing evidence that there was a contract between the decedent and her sister (the plaintiff) at the time the latter came at the decedent's invitation and insistence from Rochester, New York, to decedent's home in Puyallup to live with her and care for her. The sister remained there for 16 years and performed the duties requested by decedent. This court held that the terms of the contract had been proven with reasonable certainty. The *existence* of the contract, while denied in the answer, was practically conceded on the appeal. We find no distinction between the *Ellis* and *Jennings* cases as to the quantum of proof required to establish the *existence* of a contract to devise or bequeath property.

In the case at bar there is no evidence to support the finding that a contract to devise or bequeath property existed. At most, it shows that plaintiff worked long hours as a farm hand and also performed nursing services and other such work not ordinarily performed by a farm hand during a period of 24 years. He received $45 per month plus room and board (except for the 5-year period previously mentioned). There is no evidence that his acceptance of this compensation was predicated on a contract that his employer would leave him the farm and other property on her death. In fact, he did not ever assert the existence of such a contract until 13 months after his employer's death. In the meantime, he had filed his claim with the administrator for $304.35 as being the balance due him for services rendered prior to her death.

The evidence shows that his employer was highly pleased with his services and that she expressed to her neighbors an intention to give him the farm and other property when she died.

In his brief, plaintiff asks the rhetorical question, "Is it probable or credible that Respondent or any person would work for these sums without a contract or agreement to receive some other compensation?"

As pointed out above, it is immaterial whether the compensation received by plaintiff for his services were above, below, or equal to the going wage for farm hands in the community at that time. The argument that nobody would have worked so hard for that compensation without a contract with his employer to leave him the farm and other property is a pure non sequitur as proof of the existence of such a contract.

Such reasoning, if accepted by the courts, would place every employer's estate in jeopardy. Any employee of long standing could claim, upon his employer's death, that he had not been paid enough and that he had accepted less than the going scale of wages because he had relied upon a contract with his employer to leave him the business upon his death. In deciding the factual issue as to the existence of such a contract (which must be proven by clear, cogent, and convincing evidence beyond all legitimate controversy), the court cannot consider whether an adequate wage was paid to the employee, and then, if found to be too small, enter a decree of specific performance directing that he receive the business upon the employer's death.

The fallacy of such reasoning is illustrated in *Sweetser v. Palmer*, 147 Wash. 686, 267 Pac. 432 (1928), where a farm hand, who had resided on a 40-acre dairy farm belonging to the decedent and had worked there for 26 years prior to her death, during which period he had received room, board, and expense money (but no salary), instituted an action against her estate. He alleged two alternative causes of action: (1) a contract wherein he was to perform services for decedent during her lifetime in consideration of her leaving him her entire estate upon her death, and (2) for the reasonable value of his services for 26 years, being approximately $14,800. After a trial, the court denied recovery on both causes of action. On appeal, the employee practically abandoned his first basis of recovery and relied on an implied agreement with the decedent that he was to be paid the reasonable value of his services. In affirming the dismissal of the action, this court said, at p. 688:

"There is evidence, also, that the appellant performed work, during the period of his service, inconsistent with his duties as a farm-hand. He served on state election boards, acted as school clerk, and performed other services for which he received a consideration. He also, of course, received his board and lodging, money to procure his clothing and money to meet such personal expenditures as every one in his situation necessarily requires. It was shown, further, that Mrs. Hamilton bought Liberty bonds during the war period which she divided with him, and that, at a time shortly prior to her death, she had $1,200 in money, one-half of which she deposited in a local bank to the appellant's credit. She at one time consulted with her banker about making a will, and he caused a draft of one to be prepared in accordance with the directions she gave him, and delivered it to her. In this draft she named the appellant as a beneficiary to the extent of $2,000. The will, however, seems not to have been executed by her.

"The foregoing considerations seem to us to lead to the conclusion that the actual agreement was something different than the appellant contends it to be; that it is more probable the contract was one of joint adventure than a contract of hire, in which the parties agreed to work the farm together and divide the net earnings between them. But, be this as it may, the evidence, in our opinion, does not justify the conclusion that the appellant is entitled to any form of wage for the services he performed.

"Claims of the nature of the one here in question are not looked upon by the courts with favor, and are never sustained, except upon clear and convincing testimony. What we have heretofore said upon the subject we need not here repeat. . . ."

Since we are of the opinion that the evidence in this case does not establish the existence of the alleged contract conclusively, definitely, certainly, and beyond all legitimate controversy, we do not reach the other questions discussed in the briefs relative to defendant's appeal.

For the reasons stated above, we hold that the judgment and decree entered by the trial court must be reversed with directions to dismiss plaintiff's action.

With respect to plaintiff's cross-appeal, his assignments of error raise two questions which are stated in his brief as follows:

"A. Should the trial court have awarded all of the property belonging to Sarah Guenther at the time of her death to Respondent instead of only a portion of it?

"B. Did Appellant waive the provisions of R.C.W. 5.60.030 (Deadman's Statute) to the extent and to the effect that Respondent should be allowed to testify with reference to a contract and to transactions had with person since deceased?"

The first question must be answered in the negative. Since we hold that the existence of the alleged contract has not been legally established, there is no occasion for us to consider what property it covered. Hence, the trial court did not err in excluding from its judgment and decree the bank account and shares of stock owned by decedent at the time of her death.

The second question is whether the trial court erred in failing to hold that defendant had waived the provisions of RCW 5.60.030 (the so-called Dead Man's Statute) in regard to the alleged contract and his transactions with the decedent.

This assertion is based on two acts of defendant: (1) by failure to object to certain questions asked of plaintiff at the taking of his pretrial discovery deposition, and (2) by asking defendant certain questions at the trial relative to the memorandum found in decedent's house after her death but not offered in evidence. It was contended that, since defendant was permitted to testify as to his wife's finding this memorandum and showing it to him, defendant thereby waived the protection of the Dead Man's Statute. Incidentally, defendant also testified as to the contents of the memorandum and said that he had handed it to plaintiff.

As to the deposition (which was published in open court but never read in evidence at the trial), it contains, at the beginning, a stipulation of counsel that plaintiff waived no right to make objections to the testimony either at that time or at the trial. Therefore, regardless of the scope of the testimony elicited at the time of taking of plaintiff's deposition for discovery purposes, the parties agreed that there would be no waiver of any objections as to the admissibility of testimony at the trial.

■ The trial court did not err in ruling that the scope of the questions asked at the discovery deposition (which the court stated was similar to the former practice of demanding a bill of particulars) did not constitute a waiver of the Dead Man's Statute because the questions asked did not concern a transaction with the decedent, but related only to the contentions alleged in the complaint.

Neither did the trial court err in holding, upon plaintiff's objection, that the testimony given by defendant relative to the memorandum was admissible. It is clear to us that there was no waiver of the Dead Man's Statute because defendant's testimony was not related to any transaction between plaintiff and the decedent.

Since we find no merit in either of plaintiff's two assignments, the judgment and decree is affirmed on his cross-appeal.

As pointed out above, on defendant's appeal, the judgment and decree is reversed with directions to dismiss plaintiff's action.

Defendant shall recover his costs in this court.

It is so ordered.

ROSELLINI, C. J., HILL, WEAVER, OTT, and HALE, JJ., concur.

FINLEY, J. (dissenting)—I dissent. Through a barrage of legalistic rules, and assisted by the unmentioned dead man statute, the majority opinion succeeds in wreaking havoc with a needed legal social device—the contract to make a will. Overlooked or forgotten is the fact of life that contracts to make a will constitute significant devices which answer the needs of many people. As Professor Sparks has noted:

"Among aged men and women of modest means, and the vast majority of the aged are of modest means, there is a strong desire to retain ownership of what property they possess until death. There is also the desire, and it might be said the necessity, to provide care, support, and maintenance, and in many instances companionship and society, for themselves. A contract to make a will is the only legal device through which this purpose can be

achieved. A trust, even if it could be assumed that the person in need of such care did not object to transferring title to a trustee, would usually not yield a sufficient income to achieve the desired purpose. If a life estate with power to consume is attempted the estate is likely to be entirely consumed before the time arrives when it is most critically needed. The property involved often consists of real estate being used as a home. The only means of obtaining the necessary support and maintenance directly is by converting the property into money, thereby destroying the very thing that is sought to be preserved. By means of a contract to make a will such a property owner may obtain the care or nursing needed and also such intangibles as society and companionship. An agreement whereby some friend or relative moves into the old person's home and provides board, lodging, or such other services as might be agreed upon in return for a promise by the elderly person to leave the property to the friend or relative concerned can well prove a genuine economic advantage to both parties to the transaction." Sparks, *Contract to Devise or Bequeath as an Estate Planning Device*, 20 Mo. L. Rev. 1 (1955).

It is also clear that these people of modest means normally shy away from the thought of seeking advice from the legal profession. Thus, there are many who must utilize some plan for the declining years that will provide security and happiness. As Professor Sparks has pointed out, the best practicable answer is a contract to make a will, and the majority of these contracts will be created without professional help. But turning to the law, how are such people treated, in terms of their rudimentary efforts at estate planning?

As I read the majority opinion, the "law," as there expressed, requires the surviving contracting party to prove an express contract with evidence that portrays the classic elements of academic classroom discussion of the law of contracts. Superimposed on this is the ultimate in legal abstractions: a test as to clarity requiring that the contract can be said to exist "beyond a legitimate controversy." The majority does not mention the deep, dark moat that protects all estates—the dead man statute. But the surviving

party does not avoid or long escape facing this obstacle. To his further surprise, while his lawyer is trying to explain the reasons or the necessity, if any, for the dead man statute, the client-survivor is told that he must prove precisely the creation of his contract, that he must show and recreate the clang and cross of the offer and acceptance beyond a *legitimate controversy.*

My first disagreement with the majority opinion concerns its resurrection of the *Jennings* doctrine. *Jennings v. D'Hooghe*, 25 Wn. (2d) 702, 172 P. (2d) 189 (1946). The requirement that these needed contracts to devise be proved "beyond a legitimate controversy" has been too strict. As a result, the rule has heretofore been side-stepped and (according to my research) ignored since 1952. The last time *Jennings* was mentioned by this court was in *In re Boundy's Estate*, 40 Wn. (2d) 203, 209, 242 P. (2d) 165 (1952), where the argument was proffered that two lines of authority existed, one branch followed the *Jennings* rule while the other required proof that was "clear, cogent and convincing." The court avoided the issue by noting that no error had been assigned to the trial court's finding of facts, and, therefore, the court could not review the underlying basis that supported the trial court's findings. This settled the case, but obviously the issue or inconsistency is still with us.

Only three early cases followed *Jennings.* Two of these recited the *Jennings* rule, but still held that the contract had been sufficiently proved. *Jansen v. Campbell*, 37 Wn. (2d) 879, 227 P. (2d) 175 (1951); *Southwick v. Southwick*, 34 Wn. (2d) 464, 208 P. (2d) 1187 (1949). The other case applied *Jennings* and found the evidence wanting. *Groeneveld v. Dean*, 40 Wn. (2d) 109, 241 P. (2d) 443 (1952).

However, other cases have attempted to temper *Jennings.* In the first case after *Jennings,* the court recognized the "beyond a legitimate controversy" rule, but the opinion stated that "absolute certainty as to terms is not exacted; reasonable certainty is sufficient." *Ellis v. Wadleigh*, 27 Wn. (2d) 941, 949, 182 P. (2d) 49 (1947). In *Granquist v. McKean*, 29 Wn. (2d) 440, 445, 187 P. (2d) 623 (1947), the

court cited *Jennings*, but only required that the "contract be proven by evidence that is clear and unequivocal and which leaves no doubt as to the terms, character, and existence of the contract." Again, in *McLean v. Archer*, 32 Wn. (2d) 234, 241, 243, 201 P. (2d) 184 (1948), *Jennings* was cited, but the court rephrased the rule to require "conclusive, definite, or certain" proof of the contract.

While *Jennings* was dying out, a clear line of cases appeared which attempted to balance the need to protect estates with the need to protect people who had given valuable services under informal contracts. These cases required that such contracts be proved with clear, cogent and convincing evidence. *Ross v. Raymer*, 32 Wn. (2d) 128, 140, 201 P. (2d) 129 (1948); *Hardung v. Green*, 40 Wn. (2d) 595, 244 P. (2d) 1163 (1952); *Johnson v. Nasi*, 50 Wn. (2d) 87, 91, 309 P. (2d) 380 (1957); *Johnson v. Suddreth's Estate*, 59 Wn. (2d) 517, 520, 368 P. (2d) 907 (1962). This line of cases is supported by the overwhelming majority rule throughout the United States. Professor Sparks has only found three other states that follow rules as strict as those laid down in *Jennings*. Sparks, Contracts To Make Wills 24 (1956). Since the test of "clear, cogent, and convincing" evidence will properly balance the opposing considerations in these cases, I would follow the line of cases espousing this rule.

My next difference with the majority is in the area of theory and legal philosophy respecting contract law. It seems to me that the position taken by the majority is an overzealous one respecting the guarding of estates allegedly or ostensibly from plunder and mayhem, and leads to forcing the instant case into the confines of *express* formal commercial contract law. A realistic recognition of the framework or philosophy of the law of contracts and the law of wills should lead to a realization that crossbreeding will produce difficulties in any resulting product such as the contract to make a will. Note: *Contracts to Devise and Bequeath in New England*, 39 B.U.L. Rev. 63 (1959). I think it is anachronistic to insist that each new case or problem fit into the mold of a prior set of doctrines. A con-

tract to make a will is an equitable doctrine, designed to overcome the legalistic requirements of the law dealing with commercial contracts and wills. It is not inconceivable to me that the law could formulate a slightly different type of contract, or at least proof of it, to cover this social problem; in fact, I think it is the duty of the law to recognize and give effect to these arrangements.

If we must, this case could be forced into the mold of traditional contract theory. While there was probably an express contract, the evidence of it still waits outside the courthouse door, chaperoned closely by the dead man statute. However, there remains the matter of implied contracts. Their characteristics, of course, have been expounded by experts:

"Contractual duty is imposed by reason of a promissory expression. As to this, there is no difference between an express contract and an implied contract; all contracts are express contracts. But there are different modes of expressing assent. . . ." 1 Corbin, Contracts § 18, p. 39 (1963).

Professor Shattuck, after remarking that Washington cases often fail to discuss offer and acceptance when they discuss implied contracts, points out that offer and acceptance, or mutual assent, can be shown in the factual context:

" . . . A request for services is an offer if the circumstances would indicate to the other party as a reasonable man an undertaking to pay for them. A proffer of services is an offer if the circumstances would indicate to the other party as a reasonable man an expectation of payment. Acceptance is evidenced by rendition of the requested services in the one situation and by receipt of the proffered services in the other. The critical issues are invariably factual. The stress must be on the inferences about purpose, reasonably derivable from the setting in which the transaction occurred, rather than on actual purpose. Inferred purpose must often be pieced together from evidence which recreates the context of request or proffer. This evidence supplies the controlling elements, which are, to borrow Judge Steinert's felicitous phrasing, 'the ordinary course of dealing and the common understanding of men.' "

Shattuck, *Contracts in Washington*, 34 Wash. L. Rev. 24, 28 (1959).

The standard definition of a contract implied in fact is found in Judge Steinert's opinion, which is partially quoted above:

"A true implied contract, or contract implied in fact, is an agreement which depends for its existence on some act or conduct of the party sought to be charged, and arises by inference or implication from circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention on the part of the parties to contract with each other." *Ross v. Raymer*, 32 Wn. (2d) 128, 137, 201 P. (2d) 129 (1948).

The application of these principles to the facts and circumstances in the record will show that the parties actually became legally bound by a contract that is implied in fact.

The evidence shows that Mrs. Guenther's husband died on March 31, 1937. The plaintiff had been working as a logger, drawing wages of $5.60 per day. The plaintiff had a conversation with Mrs. Guenther between March 31, 1937, and April 9, 1937, but this conversation was excluded under the cold and foreboding hand of the dead man statute. In any event, the plaintiff moved onto Mrs. Guenther's farm on April 9, 1937. It is significant that the plaintiff was then 23 years old, and the decedent, Mrs. Guenther, was then 47. The plaintiff, a young man with a good job, left his job and started work for one third of his prior wage. He was paid $45 a month for the first 3 months of April, May, and June, 1937. Then his wages dropped further to $15 a month, and this continued for 5 years, until October of 1942. During this period, a mortgage on the farm was satisfied, and thereafter, the plaintiff's wages returned to $45 a month.

From these facts, and testing these facts "according to the ordinary course of dealing and the common understanding of men," and only requiring proof of the contract by "clear, cogent, and convincing evidence," I believe that a contract was shown to have been created just before the plaintiff moved on the farm. While the contract was un-

doubtedly express—that is, the offer and acceptance rang through the air—the critical requirement, mutual assent, can be implied from the surrounding facts. There can be no doubt that an agreement was reached during those critical days for the widow. She was faced with the bleak prospect of managing an encumbered farm, and a young neighbor was willing to support her and manage the farm in return for her promise to will him the farm. It is as simple as that, and the facts, even though limited by the dead man statute, prove the existence of the contract. The majority complains because it cannot find any time at which the required offer and acceptance leaped between the parties. The facts show that this requirement transpired in the short period between the widowhood of the decedent and the time the plaintiff moved on her farm and assumed the burdens of his contract. The reduction in wages was only a modification of the contract by the parties, probably in face of economic reality. This action only strengthens the conclusion that the parties had contracted. Why else would a mere neighbor, with a good job, and youth, suddenly allow his earnings to drop to nil? Here, again, the work performed by the plaintiff was certainly "beyond the scope of neighborly concern and helpfulness." *Johnson v. Suddreth's Estate, supra.*

Other events, while not proving the actual making of the contract, give support to the conclusion that one existed. First of all, Mrs. Guenther filled out a will that left the farm and all the farm equipment to the plaintiff. Unfortunately, this will was never signed, even though it was written in her handwriting. The will was not dated, but it mentioned people who passed away a considerable time before Mrs. Guenther died. This will adds weight to the conclusion that a contract existed. This principle has long been recognized in this state, even though the cases all involve revoked wills rather than incomplete wills. *McCullough v. McCullough,* 153 Wash. 625, 280 Pac. 70 (1929); *Perkins v. Allen,* 133 Wash. 455, 234 Pac. 25 (1925); *Olsen v. Hoag,* 128 Wash. 8, 221 Pac. 984 (1924); *Swingley v.*

*Daniels*, 123 Wash. 409, 212 Pac. 729 (1923). However, the principle from these cases still applies; *i.e.*, a contract to devise can be inferred when a legally defective will includes or spells out the provisions of the contract, especially when the disposition coincides precisely with the performance alleged under the claimed contract.

Yet another fact supports the conclusion that there was a contract to devise. A neighbor contacted Mrs. Guenther to secure a right of way across a portion of her land. Mrs. Guenther told the neighbor that she would have to talk with the plaintiff first to see if he would agree to the arrangement. This clearly shows that Mrs. Guenther regarded the plaintiff as having a legal right in and to the farm. Why else would she consult a mere underpaid farm hand, if that is all he was, as the majority pretends?

Finally, and I believe very convincingly, the evidence shows that in 1949 the plaintiff built his machine shop on Mrs. Guenther's farm, and in 1958, he also constructed a new barn on her land instead of on his adjoining farm. Several witnesses testified that Mrs. Guenther had repeatedly stated that the plaintiff constructed the capital improvements on her farm because the farm was to be his when she died. This indicates that there was a contract. A man simply does not construct buildings on land in the hopes of a gratuity. Naivete claims too much to cover the obvious.

The majority opinion, in construing the facts to negate the existence of a contract, stresses the point that the plaintiff filed a small claim with the administrator for his unpaid wages in a timely fashion, but waited 13 months before he asserted the existence of a contract to devise. However, I read and construe the facts differently. The plaintiff testified that Mrs. Guenther died on June 4, 1961, and he continued to occupy the farm until July 6, 1962. On this latter date, he left the farm after he received "legal papers" from the defendant herein. On the same day, the plaintiff commenced this lawsuit against the defendant. The logical conclusion is that the plaintiff failed to bring suit during these 13 months simply because he thought

he owned the farm. He testified that he knew nothing about probate matters, and apparently he had no contrary knowledge that would refute his natural conclusion until he was evicted. The filing of a modest claim for wages is not inconsistent with this conclusion; in fact, it supports the conclusion that the plaintiff thought he owned the farm on the death of Mrs. Guenther.

Thus, to conclude, viewing the evidence with the attitude born of the "ordinary course of dealing and the common understanding of men," and requiring proof that is "clear, cogent and convincing," I would hold that a contract to devise can be implied from the facts of this case. The contract was created between March 31, 1937, and April 9, 1937; the plaintiff agreed to work the farm and support the widow, and the widow agreed to devise all of her property to the plaintiff in return for his desperately needed services. Justice demands the recognition of so simple an arrangement, which the plaintiff, schooled in the science of agriculture, failed to reduce to a readily provable, documented, evidentiary picture.

HUNTER, J., concurs with FINLEY, J.

HAMILTON, J. (concurring in dissent)—I concur in the views expressed by Judge Finley in his dissent relative to the burden of proof. In my opinion the evidence, circumstantial though it be, amply supports the trial court's findings as to the existence of a contract between the parties. The majority, using *Jennings v. D'Hooghe,* 25 Wn. (2d) 702, 172 P. (2d) 189 (1946), blithely vault over *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn. (2d) 570, 343 P. (2d) 183 (1959) and *Bland v. Mentor,* 63 Wn. (2d) 150, 385 P. (2d) 727 (1963), and proceed to retry the case. The end result is to render it impossible to establish a contract to devise or bequeath property short of producing a formal written document.

I would affirm the judgment.

May 27, 1965. Petition for rehearing denied.