[No. 39524.    Department One.    November 15, 1968.]

PATRICIA ARNOLD et al., Respondents, v. ROBERT W. BECKMAN, as Executor, Appellant.*

*Reaugh, Hart, Allison & Prescott, Detels, Draper & Marinkovich,* and *Frank W. Draper,* for appellant.

*Schweppe, Doolittle, Krug & Tausend* and *Warren A. Doolittle,* for respondents.

RYAN, J.†—This is an action brought by respondents to specifically enforce an oral contract to make mutual wills, allegedly entered into by Milton A. Rhodes and Mary K. Rhodes, his wife, on June 23, 1947. The trial court found that such a contract had been executed, and decreed its performance. The appellant, as executor of the estate of Mary K. Rhodes, deceased, has appealed from that judgment, asserting six assignments of error.

Milton A. Rhodes and Mary K. Rhodes were 58 years of age and 57 years of age, respectively, when they were married in 1943. Each party had been previously married. Mr. Rhodes was a widower and had two children, the re-

*Reported in 447 P.2d 184.

†Judge Ryan is serving as a judge pro tempore of the Supreme Court pursuant to Art. 4, § 2(a) (amendment 38), state constitution.

spondents herein, by his previous marriage. Mrs. Rhodes was a widow, having six children by her prior marriage, then living, one of whom is the appellant herein.

Jacob Beckman, Mrs. Rhodes' first husband, died in 1939, leaving her an estate of the appraised value of nearly $34,000. This was consequently her separate property and through careful investment and reinvestment it grew to the approximate value of $73,000 at the time of her death on February 21, 1966. This very sizable increase in the estate was due to appreciation of the original capital, not having been added to by any additional cash.

Mr. Rhodes' first wife, Mary Elsie Rhodes, passed away in 1941, leaving an estate appraised at about $2,500, which was set aside to Mr. Rhodes in lieu of homestead. On December 3, 1965, Mr. Rhodes died, and his estate was of the appraised value of $10,500, all of which was community, except $500 which was his separate property.

During the last 15 years of their lives together, the Rhodeses' income had consisted of his pension in the amount of $27.58 per month and investment income from her property of $629.09 per month. The Rhodeses were devoted to each other and lived together in peace and harmony. However, at times, she somewhat resented what she considered an indifferent and neglectful attitude toward Mr. Rhodes on the part of his daughters, the respondents herein. Otherwise, the relationship between Mrs. Rhodes and her stepdaughters was generally friendly.

Mr. and Mrs. Rhodes consulted attorney Gordon B. Dodd on June 23, 1947. They brought with them a handwritten document in the form of a will which they had prepared in advance and which they showed Mr. Dodd, explaining to him that it expressed their wishes relative to disposition of their property after death. Mr. Dodd made a few corrections and notations on this instrument and after further discussion with them, drafted their wills, which they then executed. These wills were substantially similar, each providing that in the event of the death of the maker, all property would pass to the survivor and in case the other

spouse did not survive, the property would be distributed in equal shares to all of the children of both parties.

On April 5, 1960, Mr. and Mrs. Rhodes again conferred with Mr. Dodd, who prepared new wills for them. These wills were the same as the 1947 wills in all particulars, except that a different alternate executor was designated and the name of one of the heirs, who died subsequent to the first will, was deleted.

On September 23, 1965, Mrs. Rhodes suffered a paralytic stroke, necessitating hospitalization and resulting in blindness. A few days later, Mr. Rhodes was placed in a nursing home because of physical and mental incapacity, with the approval of his two children and the four surviving children of Mrs. Rhodes. The children then all agreed that a joint guardianship should be established for their parents and Robert W. Beckman was appointed guardian by the King County Superior Court on October 11, 1965.

Mrs. Rhodes executed a new will on October 29, 1965, by the terms of which all of her separate property was given to the children of her first marriage. Only her community interest in the property acquired by her and Mr. Rhodes was left to him, or in the event of his prior death, to her four surviving children and to his two children, in equal shares. This will was drafted by attorney Robert Allison, one of the attorneys for the guardianship, and was executed without notice to Mr. Rhodes or to the respondents.

Mr. Rhodes' will of April 5, 1960 was admitted to probate on December 17, 1965, two weeks after his death. Mrs. Rhodes' will of October 29, 1965 was admitted to probate on February 25, 1966, four days after her death.

The appellant's basic claim of error is that there was not sufficient evidence to establish that the Rhodeses had entered into a binding and enforceable contract to make irrevocable mutual wills. The respondents' only witness was Mr. Dodd who was the scrivener of the 1947 wills which are claimed to have established the contract. The only other evidence supporting respondents' position is the Rhodeses' handwritten draft of the proposed wills which was mentioned above.

Mr. Dodd was admitted to the practice of law in 1929 and estimated that he had prepared approximately 1,000 wills, regarding many of which he had no recollection. He insisted that he remembered the meeting with the Rhodeses because he had handled a couple of small collection matters for Mr. Rhodes some time before. He made no notes of his conference with Mr. and Mrs. Rhodes except for the brief corrections on the proposed handwritten drafts and kept no other record of the conversation. No mention was made in the wills to the effect that they were mutual and irrevocable, and no separate agreement or memorandum in writing so stating was executed. Consequently, the outcome of this case must rest squarely and almost exclusively on the testimony of Mr. Dodd.

No one has, nor do we now, question Mr. Dodd's sincerity and honesty. He is a lawyer of excellent professional standing and reputation and the trial judge exhibited implicit confidence in him. The question, however, remains as to whether his testimony, virtually standing alone, was sufficient to satisfy the burden of proof required to sustain a finding that a binding contract to make and keep in force mutual wills had been consummated. It now appears clear and obvious that if respondents' theory is correct, some suitable mention of the testators' agreement in the wills or some independent writing containing it, would have eliminated our present problem and that such procedure would have been a wiser course of action. But Mr. Dodd testified that he advised against doing so because he felt this would amount to "arms-length" dealing between husband and wife and that such a transaction would be harmful and damaging to the marriage relationship.

We have long been confronted with the troublesome problem of determining when the proof in any given case is adequate to permit a holding that an oral contract to will or an oral contract to make mutual, irrevocable wills has been entered into by the parties involved. The courts in other jurisdictions have had to meet the same difficulty, with the result that the amount and kind of evidence required in such cases has been described in a variety of

ways. *See* 1 Bowe-Parker: Page on Wills, § 10.43, p. 528 (1960).

A summation of 37 prior Washington cases is to be found in *Jennings v. D'Hooghe,* 25 Wn.2d 702, 172 P.2d 189 (1946). This case was a suit for specific performance of an alleged oral contract by the deceased to leave all of his property to the plaintiff in consideration of services rendered by the plaintiff in caring for the deceased during his lifetime. We summarized all of the previous decisions, pointing out that such cases where the promise rests in parol, are not favored, are regarded with suspicion, will be enforced only on the strongest evidence and when founded on a valuable consideration and deliberately entered into by the deceased. We then stated as follows at 706:

> The burden of proof was upon the proponent of the contract to prove it by evidence that was conclusive, definite, certain, and beyond all legitimate controversy. *Resor v. Schaefer,* 193 Wash. 91, 74 P. (2d) 917.

> The last-mentioned rule has been firmly adhered to by this court in every case of this nature except in *Herren v. Herren,* 118 Wash. 56, 203 Pac. 34, and *Avenetti v. Brown,* 158 Wash. 517, 291 Pac. 469, where it is said that it is sufficient that the contract can be determined with reasonable certainty.

> . . . .

> Each case of the kind now before us must rest upon its own peculiar facts and circumstances. However, individual cases cannot be decided without reference to other cases of like nature. The facts appearing in formerly adjudicated cases should and must be a guide to the determination of each case as it comes to the courts for decision. It will not do to make different decisions on cases that are alike as to the facts.

In 25 of the 37 cases, enforcement of the alleged contracts was refused.

Reviewing our past decisions, we find that the required quantum of proof in such cases has been variously defined as: "clear and convincing," *Wall v. Estate of McEnnery,* 105 Wash. 445, 178 Pac. 631 (1919); *Andrews v. Andrews,* 116 Wash. 513, 199 Pac. 981 (1921); *Allen v. Dillard,* 15 Wn.2d 35, 129 P.2d 813 (1942); "conclusive, definite and

certain and beyond *all controversy,"* (Italics ours.) *Lohse v. Spokane & Eastern Trust Co.,* 170 Wash. 46, 15 P.2d 271 (1932); *"clear,* definite and certain beyond *all reasonable criticism,"* (Italics ours.) *Wayman v. Miller,* 195 Wash. 457, 81 P.2d 501 (1938); "beyond all reasonable doubt," *Henry v. Henry,* 138 Wash. 284, 244 Pac. 686 (1926); *"conclusive,* definite, certain and *beyond all legitimate controversy,"* (Italics ours.) *Resor v. Schaefer,* 193 Wash. 91, 74 P.2d 917 (1937); *Thompson v. Weimer,* 1 Wn.2d 145, 95 P.2d 772 (1939); *Aho v. Ahola,* 4 Wn.2d 598, 104 P.2d 487 (1940).

In spite of whatever differences may appear in these statements of the basic rule, the underlying import and full impact of all that has been said, is that we have consistently demanded a high degree of proof in support of alleged oral contracts to will, and, if anything, this requirement has become more rigid than before. In *Bicknell v. Guenther,* 65 Wn.2d 749, 399 P.2d 598 (1965) we again reiterated the applicable rule set out in *Jennings, supra.* We believe *Jennings, supra,* to be the controlling rule of law in this jurisdiction and that the burden of proof must be met by evidence which is conclusive, definite, certain and beyond all legitimate controversy.

Carefully reviewing and analyzing the testimony of Mr. Dodd in the instant case, we are convinced that it falls short of measuring up to the established and accepted amount of proof required. Although he testified that he remembered the Rhodeses and his conference with them, his testimony was interspersed with such statements as: "At least, that was my interpretation"; "I may be wrong"; ". . . , but upon the ultimate deal that was in my interpretation"; ". . . if they had really intended what I thought they intended." Mr. Dodd had kept no notes, the claimed nature of the wills was not mentioned in them, no other witness testified for the respondents and the only documentary exhibit offered and admitted in support of the respondents' theory of oral contract was the handwritten draft of proposed will, which cannot conceivably be construed as adding anything of value to the respondents' position. Our conclusion is that the respondents failed to prove

the Rhodeses had entered into an oral contract to execute mutual, irrevocable wills by evidence that was conclusive, definite, certain and beyond all legitimate controversy.

The respondents urge that the cases of *Cummings v. Sherman,* 16 Wn.2d 88, 132 P.2d 998 (1943) and *Auger v. Shideler,* 23 Wn.2d 505, 161 P.2d 200 (1945), are parallel to the instant case and afford convincing support of their contentions. However, striking distinctions may be found between those cases and the present case.

In *Cummings, supra,* Mr. and Mrs. Shinn, husband and wife, consulted an attorney for the purpose of preparing and executing their wills. The attorney testified in detail regarding his conversation with them and his explanation of the legal consequences of their wills. He remembered the discussion, which included mention of specific sums to be bequeathed, examination of papers, documents and notes, some of which the attorney himself had previously prepared, and examination of a list of names and proposed cash bequests. Both wills contained substantially similar provisions relative to the spouses' disposition of their interests upon death. The property bequeathed was all community and the disposition made of it was what might normally be expected. The wills were essentially alike and the thrust of the attorney's testimony was that the spouses intended to make mutual wills and not just identical wills.

In the case of *Auger, supra,* the same factors are to be found as in *Cummings, supra,* except for the details of the conferences between the attorneys and clients and the further fact that no mention is made in the *Auger* wills which would indicate that mutual wills had been executed. But again, the property to be disposed of was all community and both wills left it to the same natural heirs. There were also two other witnesses who testified in support of the claim of mutual wills, although apparently little weight was accorded their testimony. The attorney in this case, the court found, testified to facts and not mere conclusions. He related some of the peculiar circumstances surrounding his consultations with the testators and the events which transpired at the time of executing the wills.

In both *Cummings, supra,* and *Auger, supra,* this court restated the basic rule that agreements of this kind must be proved by evidence which is "conclusive, definite, certain, and beyond all legitimate controversy." There is some criticism that *Auger, supra,* although following the aforesaid standard of proof, does not preclude the court from drawing "inferences" from the facts and circumstances that are highly probable. This inadvertent language in *Auger, supra,* cannot be construed as a modification of the stated standard of proof required and cannot be considered as indicating that the decision was based on anything but actual facts as the court found them to be.

The factual situation in the present case presents a marked contrast to *Cummings, supra,* and *Auger, supra,* in many particulars. Attorney Dodd's testimony, however honest, was not convincing. The property involved consisted of only approximately 12½ per cent community and the balance of about 87½ per cent was the wife's separate property. The provisions of the wills, leaving the same shares to each of the husband's two children as to each of her children by her first marriage, during which the bulk of the total property was acquired, were not equitable or what would naturally be expected. The respondents were unable to produce any corroborative evidence of value.

As we have previously stated, in determining a case of this kind, we must refer to the facts and circumstances of other similar cases, yet each case must rest upon its own peculiar facts and circumstances. *In re Fischer's Estate,* 196 Wash. 41, 81 P.2d 836 (1938); *Jennings v. D'Hooghe, supra.*

It is our opinion that the respondents have failed to establish their claim by the required quantum of evidence. In view of this, it is not necessary that we consider appellant's other assignments of error.

The judgment is reversed.

WEAVER, ROSELLINI, HALE, and McGOVERN, JJ., concur.