

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | |
|---|---|
| In the Matter of the Estate of ) | |
| ) | No. 37733-4-III |
| MARGARET D. HILL ) | |
| ) | |
| Deceased. ) | UNPUBLISHED OPINION |

STAAB, J. — On July 6, 1963, Margaret and Silvester[1] Hill married, blending their two families. In 2003, they executed reciprocal wills leaving everything to each other with the alternate residual divided equally among their collective five children. After Silvester's death, Margaret revised her will to essentially disinherit her stepson Martin Hill and reduce the gift to her son Billy Hill. After Margaret's death, Martin[2] challenged her last will as void, claiming that the reciprocal wills were mutual wills and thereby irrevocable. The trial court granted the Estate's motion for summary judgment, holding that Martin's evidence failed to raise a genuine issue as to whether the spouses intended to enter into an agreement to create mutual wills. Martin appeals.

---

[1] Silvester's name has different spellings throughout the record. We adopt the spelling used in his marriage certificate.

[2] Because several of the family members have the same last name, we refer to them using their first name. No disrespect is intended.

We affirm the trial court's summary judgment in favor of the Estate. Because the wills were reciprocal and not mutual, Margaret was free to change the terms of her will at any time.

FACTS

Because this case was decided on summary judgment, we consider the following facts in a light most favorable to Martin as the non-moving party. Margaret Hill and Silvester Hill married in 1963, blending their families from prior marriages to include Margaret's three biological children Debra Delong, Jerry Smith, and Larry Smith, and Silvester's biological son Martin Hill. The couple had one child together, Billy Hill.

In 1974, Margaret and Silvester executed and recorded a standard three-prong community property agreement (CPA). The CPA provided that all property of either spouse was immediately declared to be community property. Upon the death of either spouse, title to all community property would immediately vest in fee simple in the surviving spouse. The CPA was recorded with the Okanogan County Auditor. There is no evidence that the CPA was explicitly revoked in writing.

Prior to his marriage to Margaret, Silvester owned three pieces of real property deeded in his name alone. Shortly after recording the CPA, Silvester executed and recorded deeds adding Margaret's name to two of these parcels. Title to the third parcel remained in Silvester's name.

During their marriage, Silvester unilaterally executed and modified his own will at least two times, once in 1984 and again in 1993. In 2003, attorney James R. Thomas drafted new wills for both Silvester and Margaret. All of Silvester's prior wills were revoked when he executed his final will in 2003. The 2003 wills were identical in content, with the only distinction being the named spouse/testator/testatrix. The identical wills named each other as primary executor with Jerry Smith, Margaret's son, the first alternative and Billy Hill, the couples' son, as a second alternative executor. The residue of the estate was bequeathed entirely to the surviving spouse. In the event of no surviving spouse, the alternate residue disposition provided that the estate would be divided equally among the five children, with specific instructions for distribution. The 2003 wills do not mention or revoke the previously executed community property agreement.

Silvester died on May 26, 2004, after 41 years of marriage to Margaret. Margaret did not probate Silvester's will but instead used his death certificate to transfer the real estate into her name. Nearly three years later, in 2007, Margaret executed a new will, revoking her 2003 will. The new will named Jerry and Larry co-personal representatives. Other than personal property specifically disposed of the 2007 will left Martin $200.00 and nothing else. Margaret bequeathed Billy $20,000.00 while acknowledging that he had already received 27 acres of land from Silvester and herself. She left Debra $20,000.00. All remaining real property was split between Jerry and Larry with the

3

condition that the two parcels of land be sold if necessary to make her cash distributions to the other children.

After Margaret died in 2019, her 2007 will was admitted into probate and her son, Jerry, was appointed estate administrator. Martin filed a petition to contest Margaret's 2007 will alleging that the 2007 will was invalid because the 2003 wills were irrevocable mutual wills. The estate filed for summary judgment, asserting there was no evidence of an agreement to draft mutual wills.

Martin responded to the motion for summary judgment by submitting extrinsic evidence in an attempt to demonstrate that the 2003 wills were mutual wills. Both Martin and his half-brother Billy submitted declarations. In his declaration, Martin asserted his "understanding" of the contents of the 2003 wills was that when Margaret died the estate would be distributed "to all five children." CP at 110-111. Billy asserted that Silvester told him that "the new [2003] wills would vest all property, both Silvester's separate property and his and Margaret's joint property together and that it would be split between the five children." CP at 123. Billy also claims that Silvester told him that Margaret wanted Larry and Jerry to be the executors but that Silvester did not, "so they compromised, each choosing one." *Id.* Billy indicates that he "understood" that Silvester agreed to include his separate property in the 2003 will and that Margaret agreed that their community property would be split between all five children. *Id.*

4

Billy's declaration also describes his conversation with Silvester shortly before Silvester passed away. During this discussion, Billy claims Silvester was distraught and said "'they,' who [Billy] took to mean Margaret and Larry, had talked [Silvester] into 'signing something [he] shouldn't have signed.'" Clerk's Papers (CP) at 125. Billy also claims that Silvester told him that Silvester intended for all the property to be split between the five children and that "he was concerned that after his death this would not happen and that he wanted it very clear what his desire was with regards to his and Margaret's property." *Id.* Billy claims that Silvester told him that "he did not want Larry to come into exclusive possession of the 'fields, house, and waterfront property.'" *Id.* Billy speculates that Silvester "clearly understood that by executing the 2003 Will that this would cause his desired benefits to be in place, even if he died before Margaret." *Id.*

During the summary judgment hearing, Martin attempted to admit a file note allegedly written by Thomas Benner, the drafter of Silvester's 1993 will. The note indicated that Mr. Benner spent considerable time in 1993 advising Silvester of community and separate property issues, and noted that Silvester understood the concepts. While the note suggests that Benner was aware of Silvester's real estate holdings, there is no mention of the community property agreement. The note was unsworn and the trial court excluded it as unsworn hearsay. Attorney James Thomas, the drafter of the 2003 wills, died in March 2013 and was thus unable to testify regarding the intentions of either spousal decedent in 2003.

The trial court granted summary judgment in favor of the estate. The court noted there was no evidence of Margaret's intent to enter into a contract to create mutual wills. The trial court found the 2003 wills were reciprocal and Martin's evidence failed to meet the "high probability" burden of proving an agreement to draft mutual wills.

Martin appeals.

ANALYSIS

On appeal, Martin raises a somewhat circular argument. He claims that the 2003 wills were mutual wills that effectively revoked the 1974 community property agreement. If the CPA was revoked, Margaret could not take title to real property under the CPA, but instead was required to probate Silvester's estate under the 2003 will. By probating Silvester's estate, Margaret could be said to have accepted the benefits of the mutual will and would thereby be precluded from changing her will.

This circle of logic breaks down however, because there is no evidence that the spouses, particularly Margaret, manifested a mutual intent to enter into a contract to create mutual wills. While the parties disagree about the admissibility of most of Martin's proposed evidence, we find Martin's evidence insufficient to overcome his burden on summary judgment and therefore do not address the admissibility issue. Moreover, because we affirm the trial court's judgment, holding that the wills were reciprocal and not mutual, we do not need to decide whether the parties' earlier community property agreement was rescinded. Whether Margaret obtained title to

6

property by way of the CPA or Silvester's 2003 will, she was not prohibited from changing the testamentary disposition of her own will.

A.   STANDARD OF REVIEW

A trial court's order granting summary judgment is reviewed de novo. *Higgins v. Stafford,* 123 Wn.2d 160, 168, 866 P.2d 31 (1994). Summary judgment is appropriate if the record and all reasonable inferences drawn in favor of the non-moving party demonstrate the absence of any genuine issues of material fact, that a reasonable fact finder could only reach one conclusion, and the moving party is entitled to judgment as a matter of law. CR 56(c); *Higgins*, 123 Wn.2d at 168-69. If the moving party meets the initial burden of showing the absence of an issue of material fact, the burden shifts to the non-moving party to make a showing sufficient to establish the elements of their case at trial. *Kitsap Bank v. Denley*, 177 Wn. App. 559, 568-69, 312 P.3d 711 (2013). A material fact is one on which the outcome of the litigation depends in whole or in part. *Id.* If the non-moving party fails to provide proof of an essential element of their case, then all other facts are rendered immaterial, and the motion should be granted. *Id.*

B.   RECIPROCAL AND MUTUAL WILLS

"Mutual wills are two wills that are 'executed pursuant to an agreement between two individuals as to the manner of the ultimate disposition of their property after *both* are deceased.'" *Portmann v. Herard*, 2 Wn. App. 2d 452, 461, 409 P.3d 1199 (2018) (quoting *Newell v. Ayers*, 23 Wn. App. 767, 769, 598 P.2d 3 (1979)). "The legal effect of

mutual wills is that when one of the individuals dies and the survivor accepts the benefits conferred by the deceased's [mutual] will, the survivor is bound to dispose of his or her property as previously agreed." *Id.* (citing Newell, 23 Wn. App. at 769). When the benefits of a mutual will are accepted, the agreement becomes irrevocable, and the second mutual will cannot be changed. *Id.* These fixed obligations will be specifically enforced. *In re the Estate of Richardson*, 11 Wn. App. 758, 760-61, 525 P.2d 816 (1974).

"Reciprocal wills" on the other hand, are similar or identical wills without an agreement to restrict the other from changing his or her will at a future date. *Auger v. Shideler*, 23 Wn.2d 505, 509, 161 P.2d 200 (1945).

In this case, Martin argues that the 2003 wills signed by Silvester and Margaret were mutual wills, not simply reciprocal wills. Whether the parties entered into a contract to devise is a question of fact. *Newell*, 23 Wn. App. at 769-70. An agreement to execute mutual wills is usually expressed within the will itself. *See Id.* at 770. Martin acknowledges that the 2003 wills do not provide express provisions for mutual wills.

This is not necessarily fatal, but proof of an oral contract to devise requires the production of "very strong" substantial evidence that manifests the existence of the contract to devise to a high probability as fact. *Cook v. Cook*, 80 Wn.2d 642, 644-47, 497 P.2d 584 (1972). Oral contracts to devise are not favored despite being occasionally recognized in equity. *Portmann*, 2 Wn. App. 2d at 462. Since Martin's burden of proof at trial is akin to a burden of clear, cogent and convincing evidence, we incorporate this

8

standard on summary judgment. *Id.* at 462-63. As the non-moving party, Martin must present significant evidence to demonstrate a high probability that his claim will prevail at trial. *Id.* He may not rely on speculation or mere conclusory claims that facts are contrary. *Meyer v. Univ. of Wash.*, 105 Wn.2d 847, 852, 719 P.2d 98 (1986).

To establish an oral contract to devise, Martin must produce substantial evidence to raise an issue of material fact on three elements: (1) mutual intent to create a contract to devise and recognition of formation, (2) performance of the contract terms as consideration, and (3) reliance on the agreement. *Cook*, 80 Wn.2d at 645-47 (citing *Jennings v. D'Hooghe*, 25 Wn.2d 702, 706, 172 P.2d 189 (1946)). Conjecture and statements of intention alone do not necessarily support the existence of an express contract to devise. *Id.* at 644-45. Additionally, intentions to devise do not necessarily support the formation or existence of intentions to contract to devise. *Id.* at 648.

In this case, Martin argues there is significant evidence of an oral contract to create mutual wills. First, he contends that the provisions of the 2003 wills infer an agreement to create mutual wills. He points out that the 2003 wills were identical in most respects, drafted by the same attorney and signed on the same date. While these circumstances clearly demonstrate reciprocal wills, it does not follow that they evince mutual wills. "[R]eciprocal wills, although executed simultaneously, do not in themselves constitute evidence of a contract to execute [mutual] wills and keep them in effect." *Dahlgren v. Blomeen*, 49 Wn.2d 47, 50, 298 P.2d 479 (1956).

Martin also points to concessions allegedly made by Margaret and Silvester as evidence of a specifically negotiated agreement to create mutual wills. He cites *Auger* in support of this argument. In *Auger*, the attorney who drafted the decedents' wills testified that the decedents were clear on their intent to create mutual wills despite the lack of such recitals in the documents. *Auger*, 23 Wn.2d at 510. Specifically, the attorney testified that the wife was adamant that the grandchildren of her deceased son receive his proportionate share of inheritance and would not sign the will without this provision. In addition, the wills devised life estates to the other spouse contingent upon remaining unmarried. Although the wills did not specifically identify an agreement to create mutual wills, the attorney's testimony of their clear intent to do so was sufficient to overcome the presumption disfavoring parol evidence of a contract to devise. The court found that the mutual promises constituted the consideration for the agreement.

In this case, Martin argues that concessions made by Silvester and Margaret in their 2003 wills provide consideration for an agreement to create mutual wills.[3] But consideration is irrelevant if there is no evidence of their mutually-manifested intentions to create non-revocable wills. *See Portmann*, 2 Wn. App. 2d at 467 (evidence

---

[3] At the motion on summary judgment, Martin produced a file note from the attorney who drafted Silvester's 1993 will. The note is ambiguous and irrelevant. While it indicates that the attorney discussed concepts of separate and community property with Silvester, it does not acknowledge the community property agreement. Nor does the note have any relevance to Silvester's intentions ten years later when he drafted a new will. Since we find the note unpersuasive, we need not answer the Estate's hearsay objection.

demonstrating consideration for an agreement to execute mutual wills did not

demonstrate intent to enter into such an agreement). Demonstrating that each spouse

made concessions is not evidence that Margaret manifested an intent to create mutual

wills, much less evidence that makes it "highly probable" that such a fact could be proved

at trial. *See Kitsap*, 177 Wn. App. at 569-70.

Martin also suggests that if the wills were merely reciprocal, and failed to rescind

the CPA, then the wills were essentially useless because there would not be a residual

estate to transfer. However, as pointed out by the Estate, this argument fails to recognize

the alternate residual bequest clause that would become effective when the second spouse

died. *See Portmann*, 2 Wn. App. 2d at 466-67 (alternate residual clauses in reciprocal

wills were not evidence of testator's intention to enter into an agreement to execute

mutual wills).

Martin also contends that the circumstances surrounding the execution of the 2003

wills are further evidence of Silvester and Margaret's intentions to create mutual wills.

After executing a community property agreement in 1974, Martin points out that

Silvester retitled two parcels of land as community property while retaining sole title to a

third parcel. In 1984 and again in 1993, Silvester unilaterally executed wills that

contradicted the community property agreement by devising this property to his sons.

The provisions of his 2003 will were significantly different from Silvester's prior wills,

and Martin argues that both spouses made concessions on property for their natural-born

children so that the total estate would be divided equally among the five children. He

also points to evidence suggesting that Silvester and Margaret negotiated the executors

for each will and eventually compromised on the surviving spouse, then Margaret's son,

Jerry Smith, and then Billy Hill. Martin contends that Silvester would not have signed

the 2003 will without the compromise on named executors.[4] Silvester allegedly told

Billy that the 2003 wills would combine all of the property and then divide it equally

among the five children.

This evidence is insufficient to overcome the presumption of reciprocal wills and

demonstrate a parol agreement to devise mutual wills. Indeed, even Martin's evidence

calls into question Silvester's understanding and intentions. In his declaration for

summary judgment, Billy testifies that he heard Silvester expressing doubt on his

deathbed about being talked into "signing something [he] shouldn't have signed." CP at

125. This statement, if true, suggests that Silvester knew and understood that the wills

were revocable. Silvester's statement seems to indicate that Silvester was distressed

because he did not believe the wills would accomplish his goal. Even assuming that the

evidence suggests that Silvester intended to create identical wills, it does not demonstrate

the intention by both spouses to enter into an agreement to devise mutual wills. In other

---

[4] Martin cites a declaration from Billy Hill in support of this claim. While Billy Hill's declaration claims that Silvester discussed the alleged compromise on naming executors, there is nothing in the declaration or the record to support the assertion that Silvester would not have signed the will without this compromise.

12

words, there is no evidence of Margaret's intentions, and Silvester's intentions do not provide evidence of an agreement between Silvester and Margaret.

At best, the evidence presented by Martin demonstrates that in 2003 Margaret and Silvester intended to create identical wills. The evidence fails to raise a material issue of fact, under the heightened standard of review, as to whether there was an agreement to create mutual wills. The wills were reciprocal but there is no evidence that they were mutual. Thus, Margaret was free to change the terms of her own will at any time. Where the wills are merely reciprocal, they do not undermine the community property agreement, rendering it unnecessary for this court to address the validity of that document.

## C.   ISSUE 2:  ATTORNEY FEES

The Estate requests attorney fees, contending that Martin's appeal is frivolous. Generally, TEDRA[5] provision at RCW 11.96A.150(1) states that an appellate court, in its discretion, may award attorney fees to any party "in such amount and in such manner as the court determines to be equitable" based on "any and all factors that it deems to be relevant and appropriate." This statute gives an appellate court broad discretion regarding the award of attorney fees in relation to the resolution of trust and estate disputes. *In re Estate of Mower*, 193 Wn. App. 706, 727, 374 P.3d 180 (2016). We exercise our discretion and decline to award fees to the estate.

No. 37733-4-III
*In re Estate of Hill*


Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Fearing, J.

_____
Siddoway, A.C.J.

---

[5] Trust and Estate Dispute Resolution Act, ch. 11.96A RCW.